938 A.2d 225

**CITY OF PITTSBURGH, Appellee,**

**v.**

**FRATERNAL ORDER OF POLICE, Fort
Pitt Lodge No. 1, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 10, 2007.

Decided Nov. 27, 2007.

48

Eric Carl Stoltenberg, Esq., Lightman Welby Stoltenberg & Caputo, Harrisburg, for Fraternal Order of Police Fort Pitt Lodge No. 1.

Stephen C. Richman, Esq., Anthony Charles Busillo, Esq., Markowitz & Richman, Philadelphia, for Pennsylvania Professional Firefighters Association.

Hugh F. McGough, Esq., for City of Pittsburgh.

Richard D. Miller, Esq., Robert E. Durrant, Esq., Campbell, Durrant & Beatty, P.C., Pittsburgh, for Pennsylvania League of Cities and Municipalities.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

### *OPINION*

Chief Justice CAPPY.

The question presented in this matter is whether the Commonwealth Court's affirmance of the trial court's order is consistent with our decision in *Appeal in Upper Providence Township*, 514 Pa. 501, 526 A.2d 315 (1987). For the reasons that follow, we conclude that the Commonwealth Court's order is consistent with *Upper Providence* although our rationale differs from that offered by the lower court. We accordingly affirm.

The Fraternal Order of Police, Fort Pitt Lodge No. 1 ("FOP") is the recognized representative of the City of Pittsburgh Police Officers. The City of Pittsburgh ("City") is the employer of the City of Pittsburgh Police Officers. In 2002, the parties were unable to reach an agreement as to the terms of the collective bargaining agreement which was to take effect January 1, 2003. The parties therefore submitted the matter to interest arbitration [1] pursuant to Section Four of

---

1. " 'Interest arbitration' is the arbitration which occurs when the employer and employee are unable to agree on the terms of a collective bargaining agreement." *Pennsylvania State Police v. Pennsylvania State Troopers Ass'n (Betancourt)*, 540 Pa. 66, 656 A.2d 83, 85 n. 2 (1995). In contrast, " '[g]rievance arbitration' is the arbitration which occurs

Act 111, 43 P.S. § 217.4.[2]

On February 14, 2003, the Act 111 interest arbitration board issued an award setting forth the new terms and conditions of employment governing the years 2003 and 2004 ("2003–04 Arbitration Award"). The provision which is at issue in the present appeal concerns the health insurance benefits which current employees can expect to receive upon their retirement. That provision states:

> For those retiring after January 1, 2004, *the City shall contribute* toward the cost of husband and wife coverage ..., for each employee so electing, *an amount equal to the amount charged for such insurance by the carrier providing such coverage on the date of his/her retirement.*

2003–04 Arbitration Award, 2/14/2003, at 4–5 (emphasis supplied) ("2003–04 retiree premium cap").

The FOP was displeased with, *inter alia*, the 2003–04 retiree premium cap. It appealed to the trial court requesting that it vacate the 2003–04 retiree premium cap. The trial court denied the FOP relief on this issue. First, the court stated that "[t]he cap placed by the Board on the City's contribution to the cost of health care coverage for officers retiring after January 1, 2004 carried forward and renewed a mutually agreed to contractual right in place since January 1, 1996." Tr. ct. op. at 6–7. It also stated that the 2003–04 retiree premium cap was valid as it affected only those police officers who were retiring at a future date.

The FOP appealed to the Commonwealth Court. Among its issues on appeal was its challenge to the 2003–04 retiree premium cap. Specifically, the FOP asserted that via the 2003–04 retiree premium cap, the award violated the Contract Clauses of the United States and Pennsylvania Constitutions [3] as it worked an unconstitutional retroactive reduction in re-

when the parties disagree as to the interpretation of an existing collective bargaining agreement."

**2.** Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1–217.10. Act 111 applies only to police and fire personnel.

**3.** *See* U.S. CONS.ART. I, § 10; PA. CONST. ART. I, § 17.

tirement benefits. Furthermore, the FOP asserted that the award violated 53 Pa.C.S. § 2962(c)(3) of the Home Rule Charter and Optional Plans Law prohibition against municipalities "diminish[ing] the rights or privileges of . . . any present municipal employee in his pension or retirement system." [4]

The Commonwealth Court denied the FOP relief. *City of Pittsburgh v. Fraternal Order of Police, Fort Pitt Lodge No. 1*, 850 A.2d 846 (Pa.Cmwlth.Ct.2004) (*"FOP I"*). The *FOP I* court disposed of the § 2962(c)(3) argument via a footnote. In this footnote, the *FOP I* court made no finding as to whether the 2003–04 retiree premium cap worked a diminishment with regard to pension or retirement system rights or privileges. Instead, it viewed § 2962(c)(3) as being extremely narrow in scope and that it merely "foreclose[d] a home rule charter [municipality] from unilaterally changing pensions by passing an ordinance; it does not foreclose reduction in benefits for employees through the collective bargaining process or an Act 111 arbitration award." *FOP I*, 850 A.2d at 853 n. 9.[5]

The FOP filed a Petition for Allowance of Appeal with this court. We granted allocatur, limited to the issue of whether the *FOP I* decision conflicted with this court's decision in *Upper Providence, supra.* We vacated the order of the Commonwealth Court insofar as it resolved the post-retirement health care benefits issue and remanded the matter to

---

**4.** Section 2962 details the limitations on municipal powers placed upon home rule entities. It provides, *inter alia*, that a home rule municipality shall not:

\* \* \* \* \* \*

(3) Be authorized to diminish the rights or privileges of any former municipal employee entitled to benefits or any present municipal employee in his pension or retirement system.

**5.** The *FOP I* court also rejected the FOP's constitutional claims. The court opined that an interest arbitration panel had the authority to alter benefits awarded to future retirees' benefits in previous contracts. *Id.* at 852–53. It flatly rejected the FOP's constitutional arguments, stating that "[i]f we were to adopt the FOP's position, it would mean that collective bargaining contracts and Act 111 boards could only award increased benefits and could never reduce any benefits." *Id.* at 853. As will be discussed *infra* at footnote 7, these constitutional issues are not before us.

the Commonwealth Court for consideration and analysis of this Court's decision in *Upper Providence, supra.*

On remand, the Commonwealth Court again affirmed the order of the trial court. *City of Pittsburgh v. Fraternal Order of Police,* 911 A.2d 651 (Pa.Cmwlth.Ct.2006) (*"FOP II"*). The *FOP II* court recognized that the only issue before it was an interpretation and application of our *Upper Providence* decision. The *FOP II* court observed that *Upper Providence* primarily addressed the application of a provision in 53 Pa. C.S. § 2962(c)(3).[6] Thus, the *FOP II* court interpreted our remand order as directing it to determine whether *Upper Providence's* interpretation of § 2962(c)(3) "precludes an arbitration panel from reducing post-retirement medical benefits in the future for officers who have not yet retired." *FOP II,* 911 A.2d at 653.

The *FOP II* court had two separate layers to its analysis. First, it determined that *Upper Providence* was distinguishable from the instant matter. The court opined that *Upper Providence* was limited to discussing whether an arbitration award could provide retirement medical benefits to employees who were already retired; the *FOP II* court believed that *Upper Providence* did not address whether current employees could have their future, anticipated retirement benefits impacted by an arbitration award. Thus, as the issue in the matter *sub judice* concerns only the future expectations of current employees, the *FOP II* court believed that *Upper Providence* had no application.

After concluding that *Upper Providence* had no application to the instant matter, the *FOP II* court did not terminate its analysis but instead went on to determine whether § 2962(c)(3) prohibits the alteration of the level of health insurance benefits that current employees could expect upon their retirement. The *FOP II* court reasoned that

6. As noted by the Commonwealth Court, at the time *Upper Providence* was decided, § 2962 was numbered 53 P.S. § 1–302(b)(iii). For the sake of clarity, the Commonwealth Court consistently referred to this provision as § 2962 rather than utilizing both the § 2962 and the § 1–302 enumerations. We fill follow suit and refer only to § 2962.

§ 2962(c)(3) is not so violated. In analyzing this question, the *FOP II* court did not determine whether the 2003–04 retiree premium cap constituted a diminishment in health care benefits that current employees could expect upon retirement. Rather, the *FOP II* court focused on the latter portion of § 2962(c)(3)—namely, whether health care benefits provided to FOP retirees in any fashion implicated "rights or privileges of . . . any present municipal employee in his pension or retirement system." The *FOP II* court concluded they did not. The *FOP II* court interpreted the "pension or retirement system" language to be confined to referring to only those pension or retirement systems that were statutorily created. Because the post-retirement health care benefits at issue in the matter *sub judice* were not part of a statutorily-created pension system, but rather were the creature of an arbitration award, it thus concluded that § 2962(c)(3) is not implicated.

The FOP filed a Petition for Allowance of Appeal. We granted allocatur on the issue of whether the Commonwealth Court's decision in *FOP II* conflicts with *Upper Providence.* In our order, we specifically directed the parties "to address whether the arbitrator's award approving a capping of contributions for healthcare benefits for future retirees constitutes a diminishment in benefits in a present employee's pension or retirement system." *City of Pittsburgh v. Fraternal Order of Police,* 592 Pa. 454, 926 A.2d 437 (2007).

■■■ As we commence our review of this matter, we are mindful that this is an appeal from an interest arbitration award made pursuant to Act 111. Accordingly, our review "is a very constricted one and is in the nature of narrow certiorari. Narrow certiorari allows us to inquire into only four aspects of an Act 111 arbitrator's award: (1) the jurisdiction of the arbitrator; (2) the regularity of the proceedings; (3) an excess of the arbitrator's powers; or (4) deprivation of constitutional rights." *Washington Arbitration Case,* 436 Pa. 168, 259 A.2d 437 (1969).[7]

7. The narrow certiorari test applies when reviewing appeals from both grievance and interest arbitration awards. *See Pennsylvania State Police v. Pennsylvania State Troopers Ass'n,* 656 A.2d 83 (1995).

■ The FOP focuses on the third prong of the narrow certiorari standard arguing that the arbitrators exceeded their authority in fashioning the 2003–04 Arbitration Award. This third prong does not provide a portal to unlimited review of an Act 111 arbitration award. The "definition of what constitutes 'an excess of an arbitrator's powers' [is] far from expansive." *Pennsylvania State Police v. Pennsylvania State Troopers Ass'n,* 559 Pa. 586, 741 A.2d 1248, 1252 (1999). We have stated that an arbitrator runs up against the limits of his powers when he orders an "illegal act." We have stressed that an arbitrators mere error of law does not constitute an "illegal act" and is "insufficient to support a court's decision to reverse an Act 111 arbitrators award." *Id.* Rather, an Act 111 arbitration award orders an illegal act only when it directs the public employer to do that which the employer could not do voluntarily.

■ Thus, our review of this matter is confined to determining whether the 2003–04 retiree premium cap amounted to the ordering of an illegal act. Even this limited issue telescopes down further. Our review is further channeled as this appeal is from the Commonwealth Court's decision following a remand from this Court. Our remand order directed the Commonwealth Court to apply *Upper Providence* to this matter. Thus, our review of this appeal is limited to determining whether the 2003–04 retiree premium cap constitutes an illegal act per *Upper Providence.*

Our next step then is to determine what *Upper Providence* held. At issue in that matter was whether an Act 111 interest arbitration panel exceeded its powers when it issued an award eliminating postretirement health benefits for retirees. In that matter, the township and a lodge of the FOP had a series of collective bargaining agreements in which the township had contracted to pay for the premiums on post-retirement health care benefits for retired police officers. The parties could not agree on a collective bargaining agreement for the 1983–1984 term. The dispute was submitted to interest arbitration. One of the issues the township submitted for arbitration was whether the township should continue to pay for the health

care benefit for retirees. The arbitration panel issued an award in which the benefit was maintained for 1983 but was discontinued *in toto* for 1984.

The FOP in *Upper Providence* argued that the award was illegal as it ran afoul of 53 Pa.C.S. § 2962(c)(3). We agreed. We reasoned that as the "arbitration award *discontinued* for 1984 the hospital and medical benefits after retirement until death, [it] thus 'diminish[ed] the rights or privileges of any former municipal employe entitled to benefits or any present municipal employe in his pension or retirement system'" in violation of § 2962(c)(3). *Upper Providence,* 526 A.2d at 322 (emphasis in the original).[8]

Thus, we must determine whether the 2003–04 retiree premium cap constituted a "diminish[ment of] the rights or privileges of . . . any present municipal employee in his pension or retirement system" and thus violated § 2962(c)(3). This prohibition can be parsed into two parts. The first is whether the provision in question constitutes a "diminishment"; the second is whether this diminishment impacted a benefit conferred by a "pension or retirement system". The *FOP II* court focused on the latter of these two points, namely, whether the 2003–04 health care provision impacted the FOP's constituents' rights and privileges in a pension or retirement system. As noted *supra,* the *FOP II* concluded that these post-retirement health care benefits were not part of a "pension or retirement" system as they were contractually created and not statutorily conferred. We make no pronouncement on the propriety of this reasoning and explicitly leave this issue for another day. Rather, our resolution of this

8. It is important to note that *Upper Providence* did not issue any holding regarding constitutional issues. While it did muse in *dicta* that such a diminishment in promised post-retirement health care benefits could be unconstitutional per the Contracts Clause, it also specifically noted that no constitutional issue was raised in that matter. *Upper Providence,* 526 A.2d at 322 n. 6.

Since our review in the matter *sub judice* is confined by the scope of our initial remand order to the Commonwealth Court limiting the *FOP II* court to a consideration of *Upper Providence,* we, too, will not issue any constitutional pronouncements.

matter hinges on the resolution of whether the 2003–04 retiree premium cap constituted a "diminishment".

We believe that in answering whether the 2003–04 retiree premium cap constitutes a "diminishment", we necessarily must compare it with comparable provisions in preceding agreements. By doing so, we can discern any differences. In the event that differences are detected, we would then analyze whether the differences altered a benefit conferred previously and whether this alteration constituted a diminishment or augmentation.

The first step of this analysis is to examine the contracts between the parties that immediately preceded the 2003–04 Arbitration Award. We look first at the Working Agreement which governed the parties' working relationship between January 1, 1998 through December 31, 2000 ("the 1998–2000 Working Agreement"). In the portion concerning insurance issues, the 1998–2000 Working Agreement stated that

> any employee who retires after January 1, 1996 will be allowed to continue his or her medical insurance coverage for himself/herself and spouse only, through the City. The *City shall contribute* towards the cost of this husband and wife coverage, for each employee so electing, *an amount equal to the amount charged for such insurance by the carrier providing such coverage on the date of his/her retirement.*

1998–2000 Working Agreement at 107–08 (emphasis supplied).

Following the expiration of the 1998–2000 Working Agreement, the parties entered into a new Working Agreement that was effective from January 1, 2001 to December 31, 2002 ("2001–02 Working Agreement"). The 2001–02 Working Agreement also contained a provision relative to health insurance for retirees. That provision stated, in pertinent part:

> Any employee who retires after January 1, 1996 will be allowed to continue his or her medical insurance coverage for himself/herself and spouse only, through the City. The *City shall contribute* towards the cost of this husband and wife coverage, for each employee so electing, *an amount*

*equal to the amount charged for such insurance by the carrier providing such coverage on the date of his/her retirement.*

2001–02 Working Agreement at 70 (emphasis supplied).

We now turn to 2003–04 retiree premium cap. As noted *supra,* it states that:

> For those retiring after January 1, 2004, *the City shall contribute* toward the cost of husband and wife coverage . . ., for each employee so electing, *an amount equal to the amount charged for such insurance by the carrier providing such coverage on the date of his/her retirement.*

2003–04 Arbitration Award, 2/14/2003, at 4–5 (emphasis supplied).[9]

A comparison of the underscored language in the 2003–04 retiree premium cap with comparable provisions from the 1998–2000 Working Agreement and the 2001–02 Working Agreement reveal that the provisions are identical with regard to the issue of premiums to be paid for retiree healthcare. As there is no material difference between the 2003–04 retiree premium cap and comparable provisions in the preceding two working agreements, then we cannot conclude that the 2003–04 retiree premium cap worked a diminishment. As cogently stated by the trial court, this 2003–04 retiree premium cap merely "carried forward and renewed a mutually agreed to contractual right in place since January 1, 1996." Tr. ct. op. at 6–7. Thus, as the 2003–04 retiree premium cap did not work a diminishment, there is no tension between this provision and § 2962(c)(3). Concomitantly, affirmance of the trial court's

---

**9.** Although not before us, we note that the above provisions leave open the question of whether 2003 retirees were also subject to the same retiree premium cap. We find that they were because the 2003–04 Arbitration Award states that "[a]ll terms and conditions of employment encompassed by the prior Agreement [i.e., the 2001–2002 Working Agreement] or in effect during its term, and that are not altered by this Award, shall remain in full force and effect." *Id.* at 10. Because, as noted, the retiree premium cap was reflected in the 2001–02 Working Agreement, and is not otherwise altered by the 2003–04 Award, employees who retired in 2003 would have been subject to it, notwithstanding that the challenged language facially only covers employees retiring after January 1, 2004.

order is not in tension with *Upper Providence* as this matter is wholly distinguishable from *Upper Providence*. In *Upper Providence*, the court was confronted with a true diminishment in health care coverage provided for retirees and it thus found that the award violated § 2962(c)(3).[10]

The FOP, however, strenuously argues in its brief that the 2003–04 retiree premium cap did in fact work a diminishment of a future retiree's rights and privileges. The FOP does not go so far as to make the quixotic argument that the language of the 2003–04 retiree premium cap differs from the comparable provisions in the preceding two working agreements. Rather, the FOP contends that in practice, the City has historically provided fully paid medical benefits to retired police officers even though contracts between the parties have not compelled it. The FOP recounts that in 1991, an Act 111 grievance arbitration award compelled the City to continue its past practice of paying the premiums on retiree health care policies even though the contract between the City and the FOP specifically provided that the City had no such obligation. *See* FOP's brief at 7 (referencing the August 7, 1991 Grievance Arbitration Award of Arbitrator O'Connell). The FOP goes on to state that following this 1991 grievance arbitration award, the City "continued to provide post-retirement medical benefits to retiring officers ... up to the effective date of the 2003–04 [Arbitration Award]." FOP's brief at 7.[11]

10. We issue no pronouncement on the soundness of the Commonwealth Court's rationale for distinguishing *Upper Providence* from the matter *sub judice*.

11. In support of its position that the City has in practice paid the premiums for retiree health care policies, the FOP cites to a forty-one page swath of the reproduced record. Appellant's brief at 7–8 (citing R.R. at 610a–651a). This portion of the reproduced record covers several documents: the last page of the issues submitted by the City for the 2003 interest arbitration session; the entirety of a document entitled "City of Pittsburgh Financial Position"; and a portion of a document entitled "PGH 21—Pittsburgh for the 21st Century". Our review of these forty-odd pages reveals one passage which supports the FOP's position. That passage, which is in the PGH 21 report, stated that "[t]he police contract requires all pre-age 65 retirees to pay any post-retirement increase in health care insurance costs over the City's cost at the point of retirement. This provision has not been enforced." R.R. at 651a. For purposes of this opinion, we will assume *arguendo* that

■ This line of attack is simply not responsive to the question of whether the arbitrators exceeded their powers. In fact, it does not concern the arbitrators' actions at all. Instead, it focuses on the *City's* ostensible application and interpretation of this provision following the entry of the 2003–04 Arbitration Award. Such an argument regarding the City's interpretation of the 2003–04 retiree premium cap provision has no place in our analysis of whether the arbitrators committed an illegal act when they merely readopted the premium cap for the 2003–04 Arbitration Award.[12]

For the foregoing reasons, we conclude that the 2003–04 retiree premium cap did not constitute a diminishment and thus the order of the Commonwealth Court is affirmed.

Justice CASTILLE, SAYLOR, EAKIN, BAER, Justice BALDWIN and Justice FITZGERALD join the opinion.

■

the City did indeed have a practice of paying the premiums from 1991 up until 2003.

12. We note that there is a proper forum for questions such as whether the City is improperly interpreting and applying the 2003–04 retiree premium cap in that it is enforcing this premium cap where historically it has not done so. That proper forum is not in an appeal from an interest arbitration award such as the matter *sub judice;* rather, it is grievance arbitration. *Pennsylvania State Police v. Pennsylvania State Troopers Ass'n (Betancourt),* 540 Pa. 66, 656 A.2d 83, 85 n. 2 (1995) (" 'Grievance arbitration' is the arbitration which occurs when the parties disagree as to the interpretation of an existing collective bargaining agreement.")