999 A.2d 555

**CITY OF PHILADELPHIA, Appellee**

v.

**INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 22, Appellant.**

Supreme Court of Pennsylvania.

Argued March 3, 2009.

Decided July 23, 2010.

448

450 

Nancy B.G. Lassen, Richard G. Poulson, Willig, Williams & Davidson, Philadelphia, for International Association of Firefighters, Local 22.

Eleonor N. Ewing, City of Philadelphia Law Department, for City of Philadelphia.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Chief Justice CASTILLE.**

In this appeal, we review the Commonwealth Court's Order reversing the Order of the court of common pleas in part and vacating several provisions of an award issued by an arbitration board under the Act Governing Collective Bargaining by Policemen or Firemen ("Act 111" or "Act").[1] The provisions in question required that appellee City of Philadelphia ("City") collectively bargain the effects of closing several fire compa-

---

** This matter was re-assigned to this author.

1. Act of June 24, 1968, P.L. 237, No. 111 (as amended, 43 P.S. §§ 217.1–217.10).

nies before the closures could be implemented by the City, establish a new pilot program for providing emergency medical services, and that the City revise the procedure by which paramedics fill open firefighter positions. For the reasons that follow, we affirm the Order of the Commonwealth Court, albeit on different grounds in part. Part I, Part II, Part III, Part IV(B), as to Paragraph 9(A) of the Award, and Part IV(C), as to Paragraph 9(B) of the Award, of this Opinion are supported by a majority of the Court. Part IV(A), as to Paragraph 12 of the Award, is supported by three of the six Justices participating in this decision; accordingly, this Court is affirming by an equally divided Court, the Commonwealth Court's Order invalidating Paragraph 12 of the Award.

I

The City and appellant International Association of Fire Fighters, Local 22 ("Union") were parties to a collective bargaining agreement ("CBA") that expired on June 30, 2005. After negotiations to replace the agreement reached an impasse, the Union sought binding interest arbitration under Act 111.[2] A three-person arbitration board as required by the Act was convened and sixteen days of hearings followed, during which testimony and exhibits were received. Much of the evidence centered on the City's five-year financial plan adopted pursuant to the Pennsylvania Intergovernmental Cooperation Authority Act, and whether the City could financially afford increased benefits for employees of the Philadelphia Fire Department (the "Department"). Relevant to the present appeal, the parties disagreed on both the measures that should be taken to address the safety and health impact of the City's decision to decommission several fire companies and on

2. "Interest arbitration" is to be distinguished from "grievance arbitration." "Interest arbitration" is the arbitration that occurs when the employer and employees are unable to agree on the terms of a collective bargaining agreement. "Grievance arbitration" is the arbitration that occurs when the parties disagree as to the interpretation of an existing collective bargaining agreement. *Town of McCandless v. McCandless Police Officers Ass'n*, 587 Pa. 525, 901 A.2d 991, 992 (2006).

the attrition rate that was occurring among fire service paramedics.

In mid–2006, in a 2–1 decision, the arbitration board issued its award covering the period July 1, 2005 through June 30, 2008. *See In re City of Phila. & Phila. Fire Fighters' Union, IAFF Local 22,* American Arbitration Association Case No. 14–L–360–00464–05 (June 28, 2006) ("Award"). The Award, under Paragraph 12, obligated the City to meet and discuss its intentions with the Union before the closing of a fire company. If the parties failed to agree on the "effects" of the closure,[3] the City was compelled to commission an independent impact study to address the expected financial savings and effects upon services, bargaining unit members, and safety. In the event the Union disagreed with the study's findings, the parties were to negotiate in good faith to resolve disputes surrounding firefighter safety. If those negotiations failed, the Union was permitted to submit the dispute to grievance arbitration. The arbitrator of the grievance, however, would not be able to alter the City's decision to reduce or eliminate fire companies, but could "order any necessary modifications to the plan which would maintain compliance with relevant safety standards." Award at 22–23, ¶ 12.[4]

The Award also contained two provisions, both appearing in Paragraph 9, relating to the Department's provision of emergency medical services.[5] The object of Paragraph 9 was to

**3.** The concept of agreeing on the "effects" or the "impact" of a managerial action may at first seem abstract, because the effects of an action proceed from the action itself and not from an agreement concerning what they should be. In the context of the present case, however, we understand the effects to signify adjustments to such matters as workload, training, stress management, compensation, and staffing. *Accord City of Philadelphia v. PLRB,* 138 Pa.Cmwlth. 113, 588 A.2d 67, 69 (1991).

**4.** Paragraph 12 of the Award is set forth in full at Appendix A, below.

**5.** The Department provided two levels of emergency medical service, advanced life support ("ALS") and Basic Life Support ("BLS"). Medic units and fire engines operating as first responders provided BLS, which was limited to the administration of first aid, oxygen, CPR, and automatic defibrillation. The ALS services were more sophisticated, encompassing intravenous drips, intubations, and the administration of controlled substances. The ALS units were staffed either by two

alleviate the high levels of stress, burnout, and attrition that fire service paramedics were sustaining due to the nature of their work. Paragraph 9(A) stemmed from a Union proposal and obligated the Department to create a new two-year "ALS–Engine Pilot Program." Under the Program, the Department would assign firefighters who had previously worked as paramedics to newly formed ALS Engine companies, and could cross-train paramedics who were on the Firefighter eligible list and assign them to an ALS Engine company every fourth tour of duty. Paragraph 9(B), which neither party proposed, altered the established procedure for transferring from paramedic to firefighter status, giving paramedics with five or more years of service additional points in the testing process and prohibiting the City from refusing to appoint any paramedic whose name reached the Fire Fighter eligible list.[6] *See* Award at 19–20, ¶ 9.[7]

The City-appointed arbitrator dissented from, *inter alia,* Paragraphs 9 and 12 of the Award. Relative to Paragraph 12, he expressed that the arbitration board lacked jurisdiction to fashion any award pertaining to the closure of fire companies, as that topic fell within the City's inherent managerial policy over which the City has no obligation to bargain. The arbitrator noted, moreover, that since the close of testimony, the City's position that it was only obligated to bargain concerning the impacts of fire company closure after such decommissioning had occurred, was buttressed by the Commonwealth Court's issuance of an opinion in another case involving the parties. *See Philadelphia Fire Fighters' Union, Local 22 v.*

paramedics or by one paramedic and one emergency medical technician ("EMT"). Only trained paramedics, as opposed to EMTs, provided ALS services. All firefighters became certified EMTs after five weeks of training at the Fire Academy.

6. The parties appear to agree that, although Paragraph 9(B) employs the term "eligible list" without qualification, its mandate only pertains to the two persons certified as the top performers, *see* Home Rule Charter § 7-401(h), and not the entire list.

7. Paragraph 9 of the Award is set forth in relevant part at Appendix B, below.

*City of Philadelphia.*, 901 A.2d 560 (Pa.Cmwlth.), *appeal denied*, 588 Pa. 786, 906 A.2d 545 (2006) (*Fire Fighters I* ).[8]

As to Paragraph 9(A), the dissent opined that the proposed ALS–Engine Pilot Program impinged upon managerial policy, as it interfered with "manning and standards of service." The dissent continued, "This is more than an innocuous 'pilot program.' Rather, it is a program that directly interferes with the Department's ability to establish standards of service and it interferes with the [Fire] Commissioner's ability to select and direct personnel as necessary to provide services to the citizens of Philadelphia." *In re City of Phila. & Phila. Fire Fighters' Union, IAFF Local 22*, American Arbitration Association Case No. 14–L–360–00464–05, at 6–7 (June 28, 2006) (H. Thomas Felix, II, Esq., dissenting).

Finally, the dissent took issue with Paragraph 9(B) because the subject of paramedic transfer was not a topic in controversy before the board and no evidence on the subject was presented to the board. According to the dissent, paramedic transfer only arose as a dispute between the parties after the record was closed, and was resolved by the board on the basis

**8.** The City's decision to close several fire companies was part of a Redeployment Plan the City developed in 2004. When the City refused the Union's request to maintain fire company levels pending further study of the Redeployment Plan, the Union filed, *inter alia,* an unfair labor practice charge against the City with the Pennsylvania Labor Relations Board ("PLRB"), asserting that the City's refusal to bargain with the Union before implementing the Redeployment Plan violated the City's obligations under the parties' contract. Following grievance arbitration, the arbitrator concluded that it was within the City's managerial prerogatives to implement the Redeployment Plan without collective bargaining, but that once implementation was accomplished, the impact of fire company closures had to be bargained. The court of common pleas, upon the Union's petition, vacated the arbitrator's award.

On appeal, the Commonwealth Court reversed. The court determined that the common pleas court's decision to vacate the award violated narrow certiorari, the applicable scope of review. *Fire Fighters I*, 901 A.2d at 567. In addition, the court found that even if the constraints of narrow certiorari did not apply, there was no merit to the Union's contention that the arbitrator's award was illegal, observing that case law demonstrates that the City's decision to close fire companies is a managerial prerogative that is not subject to collective bargaining. *Id.* at 568–69.

of information received outside of the proceedings. In addition, the dissent found that portion of the Award violative of state law governing preference in the hiring of veterans, and, like Paragraph 9(A), to implicate matters of inherent managerial policy, namely, the City's hiring decisions for positions in the Department.

On July 27, 2006, the City filed a petition in the Philadelphia Court of Common Pleas to vacate several provisions of the Award, including Paragraphs 9(A), 9(B), and 12.[9] As to these paragraphs, the City claimed that the arbitration board exceeded its jurisdiction or authority because they concerned non-bargainable matters of inherent managerial responsibility. As to Paragraph 9(B), the City additionally claimed that the board did not have the authority to address the subject matter, since it concerned a topic the Union failed to raise. In response, the Union filed a counterclaim, seeking the Award's confirmation. On September 6, 2006, the common pleas court denied the City's petition, granted the Union's counterclaim, and confirmed the Award. On October 6, 2006, the City filed an appeal with the Commonwealth Court, raising the same issues as to Paragraphs 9 and 12 that it raised in the trial court.

The Commonwealth Court addressed the City's issues in a memorandum opinion. *See City of Philadelphia v. International Ass'n of Fire Fighters Local 22*, No.1906 C.D.2006, 929 A.2d 1275 (Pa.Cmwlth.Aug.24, 2007) (*Fire Fighters II*). The court first observed that its scope of review in Act 111 appeals was limited to narrow certiorari, and indicated that the City's contentions that several provisions in the Award concerned topics that are not subject to collective bargaining under Act 111 or that they addressed issues that were not placed in

9. The City's Petition also requested, based upon the Pennsylvania Intergovernmental Cooperation Authority Act, that an aspect of the award that required it to make annually increasing payments to the employees' healthcare fund be vacated. The City argued that the arbitrators gave insufficient deference to its five-year financial plan and that the record did not support the conclusion that the City could afford such increases. The court of common pleas rejected these contentions. On appeal, the Commonwealth Court affirmed the trial court's decision. The City has not challenged the Commonwealth Court's decision in this regard.

dispute raised reviewable questions of the board's jurisdiction and/or authority.

Turning to the City's contentions regarding Paragraphs 9(A) and 9(B), which mandated that the City establish the ALS–Engine Pilot Program and appoint any paramedic whose name appeared on the Fire Fighter eligible list, respectively, the court explained the framework it would apply in deciding whether the provisions fell outside of Act 111's purview. The court stated:

> In general, an issue is deemed bargainable if it bears a rational relationship to an employee's duties. However, "where a managerial policy substantially outweighs the impact of an issue on employees, the topic will be deemed a managerial prerogative and non-bargainable." This court has held that it is a managerial prerogative to establish and utilize methods to select and use personnel as well as to measure and evaluate employee performance. Policies to achieve these ends are "essential to the proper and efficient functioning" of a police or fire department.

*Fire Fighters II, Memorandum Op.* at 10 (citing *Fraternal Order of Police (FOP) Rose of Sharon Lodge No. 3 v. PLRB*, 729 A.2d 1278, 1281 (Pa.Cmwlth.1999) and quoting *Schuylkill Haven Borough v. Schuylkill Haven Police Officers Ass'n*, 914 A.2d 936, 941 (Pa.Cmwlth.2006) and *Delaware County Lodge No. 27, FOP v. PLRB*, 722 A.2d 1118, 1121 (Pa.Cmwlth.1998)).

Applying these principles, the court highlighted the City's evidence on Paragraph 9(A)'s ALS–Engine Pilot Program, showing that the Program would exacerbate the current shortage of units to respond to emergency calls, hinder the City's ability to deploy resources where it believed they were needed, increase the costs of training, and burden personnel operating in the field. The court concluded that Paragraph 9(A) directly infringed upon the City's ability to manage its resources, direct its personnel, and provide its citizens the services it deemed best. The court further concluded that since "these managerial interests [of the City] have been judicially recognized as managerial prerogatives that substantially outweigh any impact on employees, the matter [in

Paragraph 9(A) ] was not subject to bargaining." *Id.* at 12. Accordingly, the court held that the arbitration board exceeded its jurisdiction and/or authority in rendering that portion of the Award. For the same reasons, the court found that the arbitration panel did not have the jurisdiction or authority to award Paragraph 9(B). The court explained:

> We reach a similar conclusion regarding the provision that: "The City may not refuse to appoint any Fire Service paramedic whose name has been reached on the Fire Fighter eligible list." As this court has noted above, it is management's prerogative "to establish and utilize a method to aid in selecting and directing its personnel and in measuring and evaluating their performance. The ability to formulate policies in these areas is essential for the proper and efficient functioning" of the department. Again, mandating that the City appoint any paramedic whose name appears on the [F]ire [F]ighter eligible list deprives the City of discretion in promotion and appointment, thereby limiting its inherent authority to select and direct its personnel.

*Id.* at 13 (quoting the Award at 19–20, ¶ 9(B) and *Delaware County Lodge No. 27,* 722 A.2d at 1121.).[10]

Likewise, the Commonwealth Court concluded that the arbitration board lacked the jurisdiction and/or authority to require in Paragraph 12 of the Award that the City arbitrate the impact of its decision to eliminate fire companies before moving forward with the closures. The court noted that its decisional law "establishes that an employer is not required to engage in pre-implementation bargaining with respect to changes in the size of its fire and police departments or plans to close stations. Rather, such policy decisions are a matter of inherent managerial prerogative not subject to arbitration or arbitral review." *Id.* at 14. Relying on its decision in *International Ass'n of Fire Fighters, Local 669 v. City of Scranton,* 59 Pa.Cmwlth. 235, 429 A.2d 779, 781 (1981), the court deter-

---

**10.** Based on the court's resolution of this issue, it did not address the City's alternative arguments that the topic in Paragraph 9(B) was not properly raised before the arbitration board and that the board erred in awarding a provision contravening the City's home rule charter.

mined that Paragraph 12's requirements impermissibly vested the Union and employees with the right to impact major governmental decisions, such as spending, budgeting, the level of fire protection the City would provide, and, ultimately, taxation. To reconcile this determination with the *Fire Fighters I* panel's holding regarding the Department's Redeployment Plan, the court explained:

> The fact that we concluded in *Fire Fighters I* that the arbitrator's decision regarding the Redeployment Plan could not be reviewed under narrow certiorari does not command a different result here. There, the arbitrator's decision stemmed, in part, [from] an interpretation of the management's rights clause [of the CBA] and fact-finding regarding [the] safety of the Plan. Moreover, the grievance arbitrator specifically found that closure of firehouses is a managerial prerogative and so refrained from entering an award outside the scope of bargainable issues. Therefore, unlike the present arbitrators, he did not exceed his authority/jurisdiction.

*Id.* at 12 n. 16.

Accordingly, the Commonwealth Court reversed part of the trial court's order and vacated Paragraphs 9(A), 9(B), and 12 of the Award. This Court granted the Union's Petition for Allowance of Appeal, asking that we consider whether the Commonwealth Court erred. *See City of Philadelphia v. International Ass'n of Firefighters, Local 22,* 598 Pa. 209, 955 A.2d 1013 (2008) (*per curiam*).

## II

As a threshold matter, we begin with the scope and standard of review in Act 111 interest arbitration appeals. Even though Act 111 provides that the decision of an interest arbitration board is final and binding on the issues in dispute and "[n]o appeal therefrom shall be allowed to any court[,]" this Court has long recognized the practical reality that review of an arbitration board's award is not entirely precluded. *See* 43 P.S. § 217.7(a); *Town of McCandless v. McCandless Police Officers Ass'n,* 587 Pa. 525, 901 A.2d 991, 997 (2006). Indeed,

shortly after Act 111 became law, this Court determined that arbitration awards were reviewable under now former Supreme Court Rule 68 ½ because, among other things, " 'no adjudicatory body has unlimited discretion,' and 'each and every adjudicator is bound by the Constitution' and particularly by 'the mandates of due process.' " *Id.* at 999 (quoting *Washington Arbitration Case,* 436 Pa. 168, 259 A.2d 437, 440–41 (1969)). Rule 68 ½ pertained generally to those decisions that were unappealable by statute and to agency decisions stated to be final and conclusive, and set forth a procedure for effecting this Court's historical King's Bench power of common law certiorari. *Id.* at 998 & n. 12; *see Washington Arbitration,* 259 A.2d at 441. Under narrow certiorari review, a court considers questions relating to four issues: (1) jurisdiction; (2) the regularity of the proceedings; (3) excess in exercise of powers; and (4) deprivations of constitutional rights. *City of Pittsburgh v. FOP,* 595 Pa. 47, 938 A.2d 225, 229 (2007). Although Rule 68 ½ was rescinded in 1972, narrow certiorari remains the appropriate construct for review of Act 111 arbitration awards. *Appeal of Upper Providence Twp.,* 514 Pa. 501, 526 A.2d 315, 318 (1987).

In applying narrow certiorari review in this case, the Commonwealth Court noted that "whether a matter involves arbitral authority or jurisdiction is not always clear[,]" and set forth its ruling by stating that the arbitration board "exceeded its jurisdiction and/or authority," in awarding Paragraphs 9(A), 9(B), and 12. *Fire Fighters II, Memorandum Op.* at 12, 13, 15 & n.9.[11] The court's apparent reluctance to specifically determine which one (or two) grounds of narrow certiorari—jurisdiction or the excessive use of powers—was implicated, and the inconsistent treatment these grounds have received in

11. The standard of review of the preliminary determination as to whether the issue involved implicates one of the four areas of inquiry encompassed by narrow certiorari is plenary, unless that preliminary determination itself depended to some extent upon arbitral fact-finding or a construction of the relevant collective bargaining agreement. *Town of McCandless,* 901 A.2d at 1000. The standard of review of the determination as to the jurisdiction or authority of an arbitration board is plenary, if the issue turns on a pure question of law or the application of law to undisputed facts. *Fire Fighters I,* 901 A.2d at 566.

cases suggest that they are not thoroughly understood.[12] Accordingly, we take this opportunity to discuss these issues to provide guidance and to better focus our review.

As observed, narrow certiorari is a settled scope of review, emanating from this Court's historical and inherent powers. The inquiry that the jurisdiction prong of narrow certiorari has traditionally posed is a single and straightforward question—did the decision-maker in the adjudicatory process act in that general class of controversies that the law empowers it to consider. *See Dauphin Deposit Trust Co. v. Myers*, 388 Pa. 444, 130 A.2d 686, 694 (1957) (citations omitted) (applying narrow certiorari review and stating: "Jurisdiction relates to the competency of the particular administrative agency or Court 'to determine controversies of the general class to which the case presented for its consideration belonged.'"), *cited in Washington Arbitration*, 259 A.2d at 441 n. 4. To answer this inquiry, a court looks to Pennsylvania's Constitution and the laws of the Commonwealth, the sources of a decision-maker's jurisdiction. *Strank v. Mercy Hospital of Johnstown*, 376 Pa. 305, 102 A.2d 170, 172 (1954).

12. In some cases, courts have viewed the assertions made here, *i.e.*, that provisions of an Act 111 award concerned a matter that fell outside the scope of collective bargaining in the Act or resolved an issue not placed in dispute, as raising a question of the board's jurisdiction. *See, e.g.*, *Westmoreland County v. Westmoreland County Detectives*, 937 A.2d 618, 620 n. 2 (Pa.Cmwlth.2007); *Marple Twp. v. Delaware County, FOP, Lodge 27*, 660 A.2d 211, 215 (Pa.Cmwlth.1995). In other cases, however, the courts have viewed such assertions as raising a claim that the board exceeded its powers. *See, e.g.*, *Town of McCandless v. McCandless Police Officers Ass'n*, 952 A.2d 1193, 1197 (Pa.Cmwlth.2008); *Board of Supervisors of Butler Twp. v. Butler Twp. Police Dep't*, 153 Pa.Cmwlth. 306, 621 A.2d 1061, 1064 (1993). This Court, too, has lapsed into imprecision in this area. *Compare City of Philadelphia v. FOP, Lodge No. 5*, 564 Pa. 290, 768 A.2d 291, 296 (2001) ("We agree . . . that the arbitrator did not have the jurisdiction to add a new issue on the first day of the arbitration hearings where the City protested the addition of such issue.") *with Upper Providence Twp.*, 526 A.2d at 322 n. 5 ("Additionally, three members of this Court have expressed the view that an arbitration panel 'does not have a free hand in designing a comprehensive agreement but must limit itself to those issues in dispute,' and 'any decisions beyond those issues submitted is in excess of the [panel's] authority.'") (quoting *Lower Merion FOP, Lodge No. 28 v. Township of Lower Merion*, 511 Pa. 186, 512 A.2d 612, 617 (1986) (plurality opinion)).

■ In Article 3, Section 31, our Constitution states: "[T]he General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the adjustment or settlement of grievances or disputes or for collective bargaining between policemen and firemen and their public employers shall be binding on all parties...." PA. CONST. art. III, § 31. In Section 4, Act 111 provides: "If in any case of a dispute between a public employer and its policemen or firemen employees the collective bargaining process reaches an impasse and stalemate ... then either party ... may request the appointment of a board of arbitration." 43 P.S. § 217.4(a). Under these provisions, then, an arbitration board is granted the power to hear and determine those disputes that arise out of the collective bargaining process between a public employer and its firefighters or police employees. Therefore, under narrow certiorari, the assertion that an arbitration board considered a controversy that is not of this type raises a question of jurisdiction.

■ By contrast, the excess of powers prong of narrow certiorari focuses upon the particular action an arbitration board took in resolving an Act 111 dispute and asks whether the action was authorized. In *Washington Arbitration*, we stated:

Whether the decision maker in an adjudicatory process has been guilty of an excess in the exercise of power depends fundamentally on whether he has gone outside the boundaries of his authority. No adjudicatory body has unlimited discretion. At the very least, each and every adjudicator is bound by the Constitution of the United States; and most are bound by even tighter strictures. The restrictions may go to the nature of the controversies which they can decide, the parties who may appear before them, the type of relief they may grant, or any other element in the adjudicatory process.

259 A.2d at 441. To illustrate the point, we referred to the *Dauphin Deposit Trust Co. v. Myers* case, in which this Court reviewed a refusal by the Secretary of Banking to issue

articles of merger on the basis that the proposed combination would result in overbanking, and observed that although the Secretary had jurisdiction over the type of controversy involved and due process had not been violated, his decision had to be reversed because the Banking Code did not give him the authority to refuse a merger for such a reason. *Id.* at n. 4.

We then explained that in Act 111 cases, since the adjudicatory power is an arbitration board which is a "creature of the Legislature," we were obligated to look to see if restrictions were placed on its powers, to measure its award against any such restrictions, and to correct any portion of its award that went beyond them, as that would reflect an act in excess of board powers. *Id.* at 441. To identify those limitations we turned to Act 111, and concluded that because the Act does not allow an illegal act, a board exceeds its powers if in its award it mandates that such an act be carried out. *Id.* at 442.

In this same vein, we have recognized that under Act 111, an interest arbitration board is "empowered to award any term or condition of employment to which a public employer and its police or fire employees may voluntarily agree," but is not empowered "to address issues outside of that realm." *Township of Moon v. Police Officers of Twp. of Moon,* 508 Pa. 495, 498 A.2d 1305, 1310 (1985) (first quotation); *Pennsylvania State Police v. Pennsylvania State Troopers' Ass'n (Betancourt),* 540 Pa.66, 656 A.2d 83, 90 (1995) (second quotation). Hence, we have treated, and we affirm that, the assertion that an award concerns matters that are not subject to the right of collective bargaining under the Act implicates review under narrow certiorari as raising an excess of powers claim. *Township of Moon,* 498 A.2d at 1306 (explaining that allegations that arbitration board lacked statutory authority to impose grievance arbitration procedure or residency requirement in award presented question of excess in exercise of powers).

Finally, several provisions in Act 111 make clear that the authority an arbitration board is given to resolve disputes in the interest arbitration process extends to only those issues that the parties identify as disputed. *See* 43 P.S. § 217.4(a)

("If in any case of a dispute ... [that] reaches an impasse and stalemate ... either party to the dispute after written notice to the other party containing specifications of the issue or issues in dispute, may request the appointment of a board of arbitration."); 43 P.S. § 217.5 ("Notice ... under [43 P.S. 217.4] shall, in the case of disputes involving the Commonwealth, be served upon the Secretary ... and, in case of disputes involving political subdivisions ... upon the head of the governing body...."); 43 P.S. 217.7(a) ("The determination of the ... board ... shall be final on the issue or issues in dispute ...."); *see also In re Arbitration Award Between Yoder Twp. Police and Lower Yoder Twp.*, 654 A.2d 651, 653 (Pa.Cmwlth.1995) ("Section 4 of Act 111 is a codification of the longstanding common law rule that arbitrators must decide all the issues presented to them, and only those issues[.]"). Therefore, an award that embraces an issue that was not placed in dispute in accordance with Act 111's requirements may be challenged under narrow certiorari as reflective of an excess of powers.

## III

### A

The delineation of those matters that are subject to the right of collective bargaining as set forth in Act 111 is central to reviewing the Commonwealth Court's determination in the instant case that the Award concerned topics that the arbitration board did not have the power to regulate. Because this issue raises a question of statutory construction, our analysis must be guided by the Statutory Construction Act of 1972 ("SCA"). 1 Pa.C.S. § 1501 *et seq.* Under SCA, it is fundamental that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). SCA provides that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). *See Colville v. Allegheny County Retirement Board,* 592 Pa. 433, 926 A.2d 424, 431 (2007). When, however, the words of

the statute are not explicit, the General Assembly's intent is to be ascertained by considering matters other than statutory language, like the occasion and necessity for the statute; the circumstances of its enactment; the object it seeks to attain; and the consequences of a particular interpretation. 1 Pa.C.S. § 1921(c); *Commonwealth v. Packer*, 568 Pa. 481, 798 A.2d 192, 196 (2002). In addition, we presume that in enacting legislation, the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable. Finally, we also presume that when enacting legislation, the General Assembly is familiar with extant law. *White Deer Township v. Napp*, 603 Pa. 562, 985 A.2d 745, 762 (2009).

■■ Guided by these principles, we first observe that the public entities that Act 111 covers make a variety of decisions. Some of these decisions relate to the public policies that public entities are responsible for formulating; some, to the governmental functions public entities undertake on behalf of their citizens; and some, to the relationship between public entities and the persons they employ. In Act 111, the General Assembly did not purport to subject every decision a public entity makes to collective bargaining. Rather, in Section 1, the General Assembly limited the right of collective bargaining to only those decisions that a public entity makes as an employer of its firefighters and police and which concern "the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits[.]" Section 1 states:

§ 217.1 Right to bargain

Policemen or firemen employed by a political subdivision of the Commonwealth or by the Commonwealth shall, through labor organizations or other representatives designated by fifty percent or more of such policemen or firemen, have the right to bargain collectively with their public employers concerning the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits, and shall have the right

to an adjustment or settlement of their grievances or disputes in accordance with the terms of this act.

43 P.S. § 217.1.

While Section 1 plainly provides that the right of collective bargaining is not absolute, the breadth of the right is not clearly stated. This is because the "terms and conditions of employment," "working conditions" or "other benefits" that Section 1 subjects to collective bargaining are themselves not further defined but are open-ended, and almost every decision a public entity reaches, including those relating to matters of public policy and governmental functions, may have an effect, however remote, on such topics. 43 P.S. § 217.1. Accordingly, we turn to factors set forth in § 1921(c) of SCA to ascertain the General Assembly's intent as to what the collective bargaining right in Section 1 encompasses.[13]

With respect to the circumstances that led to Act 111's enactment, by the late 1930s, Pennsylvania's private sector employees enjoyed the right to organize and bargain collectively through representatives of their choosing, said right emanating from the passage of the original versions of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et*

13. The statutory construction analysis of Section 1 that Mr. Justice McCaffery sets forth in his Concurring and Dissenting Opinion ("CO/DO") differs significantly from our own. The CO/DO takes the position that the words in Section 1 are not ambiguous, *i.e.*, they express explicitly which specific decisions made by a public employer, from among the many decisions it makes, are subject to collective bargaining. Yet, the CO/DO does not address the line that Section 1 draws between bargainable and non-bargainable matters. Instead, the CO/DO posits that under Section 1, any employer decision that touches upon the employment relationship, even if only tangentially, constitutes a term and condition of employment that must be bargained collectively. Respectfully, we cannot agree.

We also point out that the CO/DO's citation to *Philadelphia Housing Authority v. Commonwealth*, 508 Pa. 576, 499 A.2d 294 (1985), to counter our conclusion that the scope of the right to collective bargaining in Section 1 is not clear from the face of the statute, is inapt. In that case, we did not, as the CO/DO suggests, hold that the phrase "terms and conditions of employment" as used in Section 1 is plain and unambiguous. Rather, we concluded that Section 1 was free of ambiguity in its use of the term "public employer" and held that the Philadelphia Housing Authority was not covered under Act 111. *Id.* at 299.

*seq.,* in 1935, and the Pennsylvania Labor Relations Act ("PLRA"), 43 P.S. § 211.1 *et seq.,* in 1937.[14] In granting the right, Congress and the General Assembly had many of the same laudable aims. Both bodies sought to rectify the "inequality in bargaining power" between employer and employee that had led to industrial strife and to "encourage practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions. . . ." 29 U.S.C. § 151; 43 P.S. § 211.2(a),(b). Because PLRA was modeled after NLRA, the statutes set forth the right of collective bargaining in identical language, with a broad mandate that pay, wages, hours, or other conditions of employment be negotiated. 29 U.S.C. § 159(a); 43 P.S. § 211.7(a) ("Representatives designated or selected . . . shall be the exclusive representatives of all the employees [employes] . . . for the purposes of collective bargaining with respect to rates of pay, wages, hours of employment, or other conditions of employment[.]") *see Petition of Shafer,* 347 Pa. 130, 31 A.2d 537, 539 (1943) ("The Pennsylvania Labor Relations Act was obviously imitative of the National Labor Relations Act.").

As of 1937, and for almost thirty years thereafter, however, collective bargaining in Pennsylvania's public sector was seen as contrary to the public welfare and not allowed. *Philadelphia Housing Authority v. PLRB,* 508 Pa. 576, 499 A.2d 294, 297 (1985). Due to the persistence of labor unrest among public employees, the belief that collective bargaining should have no application in the public sector lost sway. Ultimately, in 1968, in an attempt to quell labor strife and "strike a more perfect balance between the need of the Commonwealth to

**14.** Act of July 5, 1935, 49 Stat. 449 (as amended, 29 U.S.C. § 151 *et seq.*); Act of June 1, 1937, P.L. 1168, No. 294 (as amended, 43 P.S. §§ 211.1–211.3). NLRA was an exercise of Congress' power under the Commerce Clause of the United States Constitution. *National Labor Relations Board (NLRB) v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30–32, 57 S.Ct. 615, 81 L.Ed. 893 (1937). PLRA was an exercise of the Commonwealth's police power. 43 P.S. § 211.2(e). Essentially, PLRA covers those matters over which the National Labor Relations Board, which administers the federal statute, does not have jurisdiction. *See Pittsburgh Rys Co. Substation Operators and Maintenance Employees' Case,* 357 Pa. 379, 54 A.2d 891, 894–95 (1947).

insure public safety and the rights of the worker[,]" the General Assembly finally addressed the disconnection as it pertained to front-line public safety employees, by extending the right of collective bargaining, already given to private sector employees, to firefighters and the police. *Pennsylvania State Police v. Pennsylvania State Troopers Ass'n*, 540 Pa. 66, 656 A.2d 83, 89 (1995).[15] As it had done in PLRA, in Section 1 of the Act, the General Assembly followed NLRA's model in granting the right. That is, the General Assembly did not undertake in Act 111 to list or define all of the specific topics that the right covers, but instead adopted NLRA's broad language to indicate the topics that are subject to collective bargaining. *See* 43 P.S. § 217.1; 29 U.S.C. §§ 158(d), 159(a).[16]

At the time the General Assembly passed Act 111, a body of law had developed in the federal arena with respect to distinguishing between those subjects that must be bargained under NLRA and those subjects of managerial policy and control that, despite NLRA's expansive language, remained committed to an employer's sole discretion. *See, e.g., Jays Foods, Inc. v. NLRB*, 292 F.2d 317, 320 (7th Cir.1961) (concluding that employer's decision to make changes in operations and abandon part of business was a basic management decision falling outside of NLRA's purview).

In 1964, the U.S. Supreme Court addressed the issue. In the landmark case of *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), the Court was asked to determine whether an employer's decision

**15.** Act 111 and PLRA are to be read *in pari materia*. *Philadelphia Fire Officers Ass'n v. PLRB*, 470 Pa. 550, 369 A.2d 259, 261 (1977). In *Commonwealth v. State Conference of State Police Lodges of FOP*, 513 Pa. 285, 520 A.2d 25 (1987), reading Act 111 and PLRA together under the *in pari materia* doctrine, we upheld an agency shop award as falling within the scope of collective bargaining under the Act.

**16.** Two years after enacting Act 111, in 1970, the General Assembly enacted a comprehensive statute governing collective bargaining in the public sector, the Public Employe Relations Act ("PERA"). Act of July 23, 1970, P.L. 563, No. 195 § 101 (43 P.S. § 1101.101 *et seq.*). PERA does not cover those employees who are covered by Act 111. 43 P.S. § 1101.301(2).

to contract out plant maintenance work that had been performed by his employees fell within the "wages, hours, and other terms and conditions of employment" collective bargaining provision of NLRA. In holding that the matter was bargainable under the circumstances presented, the Court found, *inter alia,* that the employer's decision fell literally within the words of the provision and that bargaining about the matter would not significantly abridge the employer's freedom to manage the operations of his business. *Id.* at 212–13, 85 S.Ct. 398.

In a highly influential concurring opinion, Justice Potter Stewart wrote that even though the right of collective bargaining was stated broadly in NLRA, the right was limited by the statute's words to a particular class of topics, and that even though most employer decisions had an impact upon the terms and conditions of employment, it was never Congress' intent to subject all such decisions to collective bargaining. *Id.* at 217–226, 85 S.Ct. 398 (Stewart, J., concurring). In the Justice's view, given the aims of NLRA and the history of its enactment, Congress' intent to limit the right of collective bargaining would be served by recognizing that those employer decisions that had an indirect or uncertain impact on the employment relationship, as well as those employer decisions that concerned matters that were fundamental to an employer's entrepreneurial control, were not to be included in the class of bargainable topics. *Id.* at 223, 85 S.Ct. 398.[17]

17. Ultimately, the Supreme Court adopted Justice Stewart's views that NLRA delineates a limited category of issues that are subject to the right of collective bargaining and that Congress did not intend in the statute to extend the right to those management decisions deemed fundamental to an employer's entrepreneurial direction and control. In *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), the Court discussed and relied upon Justice Stewart's Concurring Opinion in *Fibreboard* when it determined that an employer's decision to shut down part of its business "represented a significant change in petitioner's operations, a change not unlike opening a new line of business or going out of business entirely[,]" and thus, was not "part of [NLRA]'s 'terms and conditions' over which Congress has mandated bargaining." *Id.* at 686, 688, 101 S.Ct. 2573.

 In light of the historical development of collective bargaining for firefighters and police, the General Assembly's objective in extending the right of collective bargaining to these essential public employees, the occasion for Act 111's enactment, the legal landscape that existed at the time of the Act's passage, and the consequences of particular interpretations, it is apparent that the General Assembly intended that the scope of collective bargaining set forth in Section 1 be viewed broadly, to encompass any subject that is rationally related to the "terms and conditions of employment," including employee "compensation, hours, working conditions, pensions, retirement and other benefits." 43 P.S. § 217.1. *See Borough of Ellwood City v. PLRB,* 606 Pa. 356, 998 A.2d 589 (Pa.2010), J–7A & B–2009, *Op.* at 464, 999 A.2d at 565 (concluding that under Act 111, working conditions, a topic of mandatory collective bargaining, are those matters that bear a rational relationship to the employees duties, *i.e.,* germane to the working environment).[18] At the same time, and in light of the very same considerations, it is equally apparent that the General Assembly had no intention or expectation that the collective bargaining process would permit public employees to set matters of public policy or participate with their public employer in administering the public enterprise. Accordingly, we construe the General Assembly's use of open-ended language in Section 1 and its silence in the Act on matters of managerial prerogative as conveying the intent that matters of managerial decision-making that are fundamental to public policy or to the public enterprise's direction and functioning do not fall within the scope of bargainable matters under Section 1. *See id.* at 465, 999 A.2d at 566 (recognizing that under Act 111, matters that are managerial in nature and implicate

**18.** *Borough of Ellwood City* concerned the right of collective bargaining granted in Act 111 in a different, but related, setting. In that case, this Court considered whether Ellwood City Borough committed an unfair labor practice by implementing a ban on the use of tobacco products in the workplace and in vehicles and equipment without first collectively bargaining the matter with the labor organization that represented the Ellwood City Police. We concluded that the ban was a mandatory subject of bargaining and not an inherent managerial prerogative within the meaning of Act 111, and thus, was a subject that had to be collectively bargained under the Act and PLRA. *Id.* at 20.

significant policy concerns are not subject to collective bargaining). Such managerial prerogatives include standards of service, overall budget, use of technology, organizational structure, and the selection and direction of personnel. *Id.* at 464–65, 999 A.2d at 565–66.

In our view, this construction of Section 1 advances the General Assembly's aim to foster peaceful and productive labor relations between public employers and their firefighter and police employees and gives effect to the General Assembly's recognition that a public employer is also a public entity responsible to all of its citizens for a number of decisions that concern the public welfare. Indeed, a different construction of Section 1, which would include managerial prerogatives within its purview and thus give to only a select few the right to participate in decisions that have far-reaching political and economic implications for an entire community, would be unreasonable and inconsistent with principles upon which our system of democratic governance is founded.[19]

## B

 Turning to the application of Section 1's framework in interest arbitration appeals such as this one, it is clear that if an award bears no rational relationship to the terms or conditions of employment or acts solely on a managerial prerogative, the arbitration board has exceeded its statutory powers under Act 111 and the award must be set aside. Commonwealth Court decisions reveal, however, that assessing the propriety of most arbitration awards is not so straightforward. Because management decisions regarding policy or direction almost invariably implicate some aspect of employer-employee relations or the workplace, disputed arbitration awards more often than not concern both the terms and conditions of employment and the public employer's managerial prerogatives. Since the General Assembly did not provide a statutory standard in Act 111 for the courts to use to

---

19. The Commonwealth Court has recognized the managerial prerogatives of public employers and has concluded that they do not fall within the scope of Section 1. *See, e.g., FOP Rose of Sharon Lodge No. 3,* 729 A.2d at 1281–82; *City of Philadelphia v. PLRB,* 588 A.2d at 72; *City of Scranton,* 429 A.2d at 781.

distinguish between those awards of this type that are consistent with the scope of collective bargaining in Section 1 and those awards that are not, this Court must.[20]

Given the General Assembly's intent in passing Act 111, we conclude that, when reviewing a disputed provision in an Act 111 interest arbitration award, a court should first inquire whether the provision concerns a topic that is subject to the right of collective bargaining, *i.e.*, is rationally related to the terms and conditions of employment. If the topic is so subject, the court should next inquire whether the award also implicates the non-bargainable managerial prerogatives of a public employer. If the award does, the court must then determine whether the award unduly infringes upon the exercise of those managerial responsibilities. If the award does not unduly infringe upon their exercise, the award concerns a subject that lies within the scope of collective bargaining under Section 1, falls within the arbitration board's Act 111 powers, and is confirmable. If, however, the award unduly infringes upon the exercise of managerial responsibilities, then the award concerns a managerial prerogative that lies beyond the scope of collective bargaining, reflects an excess of the board's Act 111 powers, and is voidable.[21,22]

**20.** As it did here, at times, the Commonwealth Court has applied a balancing test, determining that since the managerial policy an award implicated outweighed any impact it would have on employees, the award was invalid for concerning a non-bargainable topic. *See, e.g., Schuylkill Haven Borough*, 914 A.2d at 941. At other times, however, the Commonwealth Court has not applied a weighing analysis, but has rejected an arbitration award because it was deemed to fall within the scope of managerial discretion, *City of Scranton*, 429 A.2d at 781, or has upheld an award because the topic at issue was deemed to affect the working conditions and safety of the employee, *City of Erie v. International Ass'n of Firefighters, Local 293*, 74 Pa.Cmwlth. 245, 459 A.2d 1320, 1321 (1983). While these formulations may represent a reasoned attempt on the part of the intermediate appellate court to vindicate both sets of competing interests in Act 111, they do not closely reflect the Act's statutory scheme.

**21.** We observe that this test mirrors the one that we articulated in *Borough of Ellwood City*. There we stated:

Consistent with the history of Act 111, as well as the above-stated policy concerns, when addressing topics which straddle the boundary between ostensibly mandatory subjects of bargaining and managerial

## IV

It remains for us to apply these principles to Paragraphs 9 and 12 of the Award. As the parties discuss Paragraph 12 first in their respective briefs, and then Paragraph 9, we also will evaluate the provisions in that order.[23]

### A

As discussed, the disagreement over Paragraph 12 involves whether the arbitration panel exceeded its powers by mandating that the City first come to agreement with the Union over the effects of a fire company closure before implementing the closure. The Union contends that the ques-

prerogatives, we believe once it is determined that, as here, the topic is rationally related to the terms and conditions of employment, *i.e.*, germane to the work environment, the proper approach is to inquire whether collective bargaining over the topic would unduly infringe upon the public employer's managerial responsibilities. If so, it will be considered a managerial prerogative and non-bargainable. If not, the topic is subject to mandatory bargaining.
*Borough of Ellwood City*, 998 A.2d at 600.

22. Mr. Justice McCaffery's CO/DO takes a radically different approach to the excess of powers aspect of narrow certiorari review; and, respectfully, we are not persuaded. Under the CO/DO's approach, if the arbitration board's award addressed the terms and conditions of employment, stated that it considered and incorporated the managerial prerogatives of the public employer, and did not mandate an illegal act, the award is unreviewable and will be upheld. Likewise, even if the board " 'insufficiently considered' management rights with respect to the working conditions at issue," the CO/DO posits that the award falls "within the realm of 'legal error,' " and is "not reviewable." CO/DO at 5 (citation omitted). In these circumstances, again, the award must be upheld.

The CO/DO's framework amounts to virtually no judicial review at all and advocates a review paradigm that even the Union has not forwarded. By contrast, as we have set forth at some length, the test we articulate squares with the review the courts have traditionally exercised in applying the excess of powers prong of narrow certiorari and reflects an approach that the General Assembly has not undertaken to revisit.

23. In the interests of judicial economy and efficiency, and because there is no dispute between the parties concerning the governing test and the essential elements of the test, we will apply the test where relevant to the Award, rather than remand this case to the Commonwealth Court for application of the test in the first instance.

tion of whether this provision is rationally related to the health and safety of the firefighters and, thus, to their working conditions, is a factual issue to be determined by the fact-finder; it stresses that the arbitrators here found, upon an extensive evidentiary record, that a rational relationship exists between company closure and firefighter safety. That being the case, the Union asserts that this Court must defer to such finding and uphold the award under narrow certiorari review. The City responds that because a requirement of pre-implementation bargaining interferes significantly with its managerial decision-making, it is non-bargainable under Act 111. In this regard, the City emphasizes that the Commonwealth Court has consistently upheld the principle that fire station closure implicates the level of services that a municipality is willing and able to afford its citizens and, as such, must fall outside the ambit of issues properly subject to arbitration. The City also argues that the underlying purpose of the mandated pre-closure bargaining is to permit the Union to influence and ultimately alter the City's decision concerning which fire companies to close. The City proffers that allowing the Union to interfere with its organizational plan in this manner would render its "right" to implement fire company closures meaningless.

The City does not dispute that the closure of fire companies may have an effect on the safety of the firefighters and the conditions in which they work. The reasons are self-evident: fire company closures may mean a greater average travel time and distance to a given fire, resulting in a higher probability of accidents en route, as well as a more dangerous situation upon arrival. Thus, it is clear and undisputed that Paragraph 12, in addressing the safety issues that firefighters may confront when firehouses are eliminated, rationally relates to the terms and conditions of employment. At the same time, however, the parties agree that final decisions concerning the size of a municipality's fire department, the creation, continuance, and closure of companies, and the redistribution of resources and a workforce are recognized as classic examples of managerial

prerogatives that a public employer decides on its own. *See generally City of Scranton,* 429 A.2d at 780–81 & n. 3.

Since Paragraph 12 concerns both the terms and conditions of employment of the City's firefighter employees and the City's managerial responsibilities, it must be determined whether Paragraph 12 unduly infringes upon the latter, through its requirements that the City reach an agreement with the Union regarding the effects of such closure and, follow a prescribed course of action of several steps, which includes grievance arbitration, in the event that such an agreement with the Union is not reached. We conclude that it does unduly infringe on the City's managerial responsibilities.

In our view, the procedure a public employer adopts for making essential decisions on managerial matters is no less significant than the decision on substance that the employer ultimately reaches. As to decisions regarding fire company closures, in Paragraph 12, the Award takes from the City the complete control it had over of its own decision-making process as to a subject that indisputably lies within its sole discretion under Act 111. That is, Paragraph 12 modifies the decision-making process the City has heretofore followed in decommissioning fire companies and imposes a further procedure upon the City that it must undertake, before a fire company can be closed. Under this provision, decisions of closure cannot be made upon the City's analysis alone, but only after what the Union considers a proper evaluation, and eventual arbitration, of the impacts of the closures. In addition, by the terms of Paragraph 12, the City is not permitted to put its closure plan into place until after it has completed the specified multi-step process. Even if no change is made to the City's initial closure plans because of those requirements, the fact remains that the City is precluded from moving forward with its plan in the timeframe that City officials believe would implement closure in an economical and efficient manner and best serve its citizens. This is no small matter in times of public fiscal economic scarcity, such as the City unquestionably faces now. Further, because Paragraph 12 inserts the Union as a participant into the City's decision-

making process and requires that the City bargain with the Union over a proposed closure's effects prior to implementation, the provision has the capacity to assert a profound influence over the City's closure decisions, and ultimately, the City's policy judgments as to spending, budgeting, levels of fire protection and emergency medical services it should provide, and the prioritization and allocation of competing essential services.

Therefore, we conclude that even though Paragraph 12 is rationally related to the terms and conditions of employment of the City's firefighters, the process it mandates unduly infringes upon the City's essential management responsibilities. Because Paragraph 12 unduly infringes upon the City's managerial prerogatives, it falls outside the scope of collective bargaining in Section 1. Accordingly, we hold that the arbitration board exceeded its powers under Act 111 in the Award in question.

B

In Paragraph 9(A) of the Award, the arbitration board sought to put into place a new type of service to be offered by the City—an ALS Engine Pilot Program.[24] According to the arbitration board, this new service would allow paramedics to rotate to engine duty which, apparently, is comparatively less stressful than the work performed as part of a medic unit. The Union, which devised the program, asserts that this was a permissible award when viewed against the backdrop of a long history of health and safety concerns arising out of paramedic burnout owing to the large volume of emergency medical assistance calls to the Department. The Union also maintains that this provision is limited and narrow, and only obligates the City to assess the utility of rotating paramedics into engine companies.

24. Although the ALS Engine Pilot Program was scheduled to run through June 30, 2008, the record and briefs do not indicate whether it was delayed pending the outcome of judicial review. As the parties have not raised the question of mootness, we will proceed to the merits.

The City answers that the arbitration board apparently thought that the City should provide more ALS units than it does at present, and that such care should be offered not only through medic units, but also through fire engines specially equipped with sophisticated medical equipment that the engines do not currently incorporate. The City states that this implies it must create a new type of vehicle to offer this higher level of care, but without any ability to transport critically ill individuals, since fire engines do not transport patients. Particularly as the greatest need, in the City's view, is for additional BLS services rather than services at the more sophisticated ALS level, the City urges that this portion of the award interferes with its managerial functions to decide the level and types of services it should provide to city residents, and to direct its personnel. The City argues that the level of services its fire department should provide—whether through the first responder engines, medic units, or something that does not currently exist such as ALS engines—as well as the type of personnel best suited to perform those services in each instance, are the province of policymakers accountable to the voters.

The Union asserts that Paragraph 9(A) is aimed at ameliorating the workload and stressful working environment that paramedics face, and it is obvious that Paragraph 9(A) is rationally related to employee duties and working conditions. But, as the City points out, Paragraph 9(A) just as obviously implicates its managerial interests in determining the level of services that it can afford to make available to its citizens, the staffing that is needed, and the manner by which its workforce should be selected and deployed. Thus, here too, the disputed issue is whether Paragraph 9(A), though rationally related to terms and conditions of employment, unduly infringes upon the City's managerial responsibilities.

We certainly do not discount the seriousness of the problem of stressful working conditions and attrition among the City's paramedic corps. But, the difficulty with Paragraph 9(A) is that it usurps the City's essential managerial responsibilities to determine the types and levels of medical emergency protection it deems necessary to provide and to select and

direct its financially-strapped resources and personnel. Again, the issue involves far more than simply working conditions. As the City indicates, under Paragraph 9(A), it must now secure ALS-equipped engines that it does not have; it must alter the way that it assigns firefighters and paramedics who will be providing medical services; and it must abandon its plan to meet an increased need for BLS services among its residents. Notably, even the Union itself touts the ALS Engine Pilot Program as a more efficient way of delivering services and managing a work force, demonstrating its implicit recognition that the program implicates managerial prerogatives. We find that Paragraph 9(A), while certainly aimed at working conditions, unduly infringes upon the City's managerial responsibilities to make workforce assignments and decide upon the levels of emergency medical services that the City can afford to provide and the manner by which such services will be delivered. Accordingly, we conclude that Paragraph 9(A) falls outside of the scope of collective bargaining in Act 111, and thus, we hold that the arbitration board acted in excess of its powers in the Award in question.

## C

Paragraph 9(B) of the Award mandates that the Fire Department assign extra points to, and hire as a firefighter, any paramedic whose name has been reached on the eligible list. The City advances several reasons to affirm the invalidation of this provision.[25] Among the reason asserted is the contention that the arbitration board exceeded its authority in awarding Paragraph 9(B) because the provision is unrelated to any topic that was certified by the parties as being in dispute before the board. In this regard, the Union counters that, although the specific requirements memorialized in Paragraph 9(B) were not placed in dispute as such, a board's ability to act within the scope of the issues actually certified is "expansive," and Paragraph 9(B) is sufficiently related to the proposals

25. Although the Union is the appellant, its opening brief includes neither a developed argument on Paragraph 9(B), nor any citation to authority. *See* Brief for Appellant at 46. Rather, the Union elected to answer the City's arguments in its reply brief. *See* Reply Brief for Appellants at 18–22. Hence, the City's argument is summarized first.

submitted by the Union aimed at improving the safety and working conditions of its paramedics because these proposals raised issues relating to compensation, health and safety, paramedic scheduling, and paramedic staffing. The Union indicates, moreover, that throughout the hearings it addressed its concerns regarding paramedic burnout. Because all past attempts by Act 111 arbitrators to address this difficulty had been unsuccessful, according to the Union, it was reasonable for the present panel to consider the required hiring as a firefighter of any paramedic certified from the eligible list to be related to the issues actually submitted.

We agree with the City that Paragraph 9(B) is insufficiently related to any issue that was placed in dispute. Here, the record shows that other than the ALS Engine Pilot Program, the Union submitted four specific proposals pertaining to paramedic schedules and compensation. These included provisions to: (1) provide paramedics with a one-hour lunch break during each work shift; (2) enhance compensation for paramedics designated to serve as preceptors for paramedic trainees; (3) make the percentage wage differential between paramedic lieutenants and paramedics fourteen percent (so as to align it with the existing wage differential between fire lieutenants and firefighters); and (4) develop and use a paramedic performance evaluation form, rather than using the firefighter evaluation form. None of these proposals is related to the concept of facilitating paramedics to leave their jobs entirely by giving them hiring preference when they apply for a different job. The Union's argument reduces to the position that Paragraph 9(B) is subsumed within these proposals because it, like the proposals, is addressed to the topic of paramedic stress and burnout. This simply is not a sufficiently direct connection to render the paramedic transfer provision an issue in dispute before the board. Therefore, we hold that the arbitration board exceeded its powers in awarding Paragraph 9(B).

## V

For the reasons set forth above, the Order of the Commonwealth Court, reversing the order of the court of common

pleas in part and vacating Paragraphs 9(A), 9(B), and 12 of the Award, is affirmed, but on different grounds as to Paragraph 9(B). Jurisdiction is relinquished.

Former Justice GREENSPAN did not participate in the decision of this case.

Justices EAKIN and TODD join the opinion.

Justice SAYLOR files a concurring and dissenting opinion in which Justice BAER joins.

Justice McCAFFERY files a concurring and dissenting opinion.

### Appendix A

Paragraph 12 of the Award requires that the following provision be added to the collective bargaining agreement:

*Company Reductions or Eliminations.* It is understood that the determination of the overall size of the Fire Department is ultimately a managerial decision. However the City remains obligated to negotiate the effects of the decision. Such decisions when made are usually irrevocable. Accordingly the parties must reach a resolution on the effects of the reduction or elimination of any engine or ladder company prior to its implementation. The following procedure is intended to reach such a resolution as quickly as possible:

1. *Discussion.* In the event that the City determines it is necessary to reduce or eliminate any fire company, it will advise the Union of its intention and promptly meet with the Union to discuss its plan.

2. *Impact Study.* In the event the City and the Union are unable to reach agreement on the effects of the City's plan, and the Union asserts that the City's plan increases the risk to Firefighter safety, then the City must commission and complete an impact study, conducted by an independent third party mutually agreed to by the parties, which study shall include but not [be] limited to:

Appendix A—Continued

 a. Detailed projections of the savings to be achieved by the proposed reduction or closure; and

 b. An analysis of the impact of the proposed action on the delivery of emergency services, the safety of bargaining unit members, and compliance with relevant safety standards including but not limited to NFPA 1710. Once the study has been completed, a copy shall be provided to the Union.

3. *Negotiations.* In the event that the Union, within thirty (30) days, registers opposition to the findings contained in the Impact Study or with the proposed reduction or elimination of companies as they relate to Firefighter safety, the City shall negotiate in good faith with the Union to resolve any disputes over Firefighter safety arising from the proposed reductions or closures.

4. *Dispute Resolution.* In the event the City and the Union are unable to resolve their issues related to the effects of proposed reduction or closure, the Union may submit any unresolved issues to the grievance procedure pursuant to the Safe Workplace provision of this Award. In addition to any other arguments raised by the parties, the arbitrator will consider the impact of the proposed reductions and/or closures on the City's financial ability to provide emergency services to the public, the City's compliance with relevant safety standards, including but not limited to NFPA 1710, and the impact o[f] the reductions and/or closures on the health and safety of firefighters. The arbitrator may not impose his or her judgment with respect to the City's decision to reduce or eliminate companies but may order any necessary modifications to the plan which would maintain compliance with relevant safety standards.

5. Nothing herein shall diminish the applicability or enforceability of other staffing provisions of the collective bargaining agreement.

Award at 21–23; *see* RR. 57–59.

Appendix B

Paragraph 9 of the Award states, in relevant part:

9. *Paramedics*

A. Effective January 1, 2007, the Fire Department will implement a two-year ALS Engine Pilot Program that will run through June 30, 2008. Cross-trained Firefighter/Fire Service Paramedics assigned to work on ALS Engine companies as part of the Pilot Program will be selected from the pool of Firefighters who have previously worked as Fire Service Paramedics within the Philadelphia Fire Department. The Fire Department may also cross-train Fire Service Paramedics who are on the Firefighter eligible list and utilize those employees on an ALS Engine. Such employees will rotate from their regularly-assigned company to work as part of an ALS–Engine company every fourth tour-of-duty.

B. *Paramedic Transfer.* The current transfer process from the class of Fire Service Paramedic to class of Firefighter will be revised as follows with regard to any appointment made on or after July 1, 2005:

1. Any Fire Service Paramedic with five (5) or more years of service who takes and passes the open, competitive examination for the class of Firefighter pursuant to Civil Service Regulations, shall receive an additional ten (10) points added to his or her examination score which will be in addition to any veteran or other points applicable under the Civil Service Rules and Regulations. *The City may not refuse to appoint any Fire Service Paramedic whose name has been reached on the Firefighter eligible list.*

Award at 19–20; *see* RR. 55–56 (emphasis added).

The final sentence above is emphasized to indicate the change from the prior award covering the 2002–2005 time period. The final sentence of the corresponding paragraph in that award provided as follows:

Any Fire Service Paramedic who is appointed to the class of Firefighter under this provision shall be appointed as an

entry-level Firefighter, provided that their pensions continue to accrue without a break in service.

*In re Arbitration between Local 22, IAFF, AFL–CIO, and City of Phila.,* American Arbitration Association Case No. 14–L–360–00317–02–W, at 11–12 (March 20, 2003); *see* RR. 697–98.

Justice SAYLOR, concurring and dissenting.

I join Parts I, II, III, IV(B), and IV(C) of the Majority Opinion, and respectfully dissent from Part IV(A), pertaining to Paragraph 12 of the arbitration award (the "Award").

As the majority develops, the parties' disagreement over Paragraph 12 involves whether the arbitration panel exceeded its powers by mandating that the City reach agreement with the Union over the effects of a fire company closure before implementing the closure. I would hold that this aspect of the Award is valid: as the majority explains, Paragraph 12 reasonably relates to firefighter health and safety, *see* Majority Opinion, *op.* at 474, 999 A.2d at 572; in my view, moreover, it does not unduly burden the City's managerial responsibilities. My reasoning follows.

The parties agree that final decisions concerning the size of a municipality's fire department, the creation, continuance, and closure of companies, and the redistribution of the City's workforce, are essentially managerial in character and, therefore, beyond the scope of Act 111 interest arbitration. *See generally Int'l Ass'n of Fire Fighters, Local 669 v. City of Scranton,* 59 Pa.Cmwlth. 235, 237–38 & n. 3, 429 A.2d 779, 780–81 & n. 3 (1981) (surveying jurisdictions and suggesting that the requirement to arbitrate relative to employee health and safety would justify an award increasing the number of firefighters on duty at a given time at a specific fire station, but that forcing management to negotiate general questions of manpower deployment under the guise of safety would fall beyond the arbitration panel's powers, as such questions implicate basic policy decisions of the governing body). The contested issue here is whether, as a prerequisite to fire company closure, the arbitration panel may require the City to reach an

agreement with the Union regarding the effects of such closure and, in the event an agreement is not reached, follow a prescribed course of action to settle differences.

As a general principle, an interest arbitration award under Act 111 may include a mechanism for binding arbitration of grievances and disputes. *See Moon Twp. v. Police Officers of Moon Twp.*, 508 Pa. 495, 508, 498 A.2d 1305, 1312 (1985). In *Moon Twp.*, the award included a mandatory procedure for binding arbitration of grievances arising under any of the terms and provisions contained in the award, *see id.* at 499 n. 2, 498 A.2d at 1306 n. 2 (setting forth the disputed provision), whereas, here, the procedures are more specific and are directed to an area of decision-making that, as noted, is admitted to be part of the managerial task of the employer. Paragraph 12 modifies the decision-making process concerning fire company closure by adding procedural mechanisms designed to vindicate the Union members' safety interests. These procedures include discussion, impact study, negotiations, and dispute resolution through "the grievance procedure pursuant to the Safe Workplace provision of this Award." Award at 22, ¶ 12(4); *see* Majority Opinion, *op.* at 482, 999 A.2d at 575–76 (Appendix).[1]

Paragraph 12 appears intended to facilitate the labor relations process on significant issues involving firefighter safety. It regulates working conditions, for Act 111 purposes, as worker safety is integrally related to the circumstances under which the work is performed. *Accord* Majority Opinion, *op.* at 474, 999 A.2d at 572. *See generally City of Erie v. Int'l Ass'n of Firefighters, Local 293*, 74 Pa.Cmwlth. 245, 247–48, 459 A.2d 1320, 1321 (1983). It is also consistent with Act 111's overall objective "to alleviate labor strife in occupations involving critical government functions by, *inter alia*, providing an

---

1. Paragraph 7(A) of the Award, entitled "Safe Workplace," requires the City to provide bargaining unit members with safe and healthful conditions of employment "free from recognized hazards that cause or are likely to cause death or serious physical harm[.]" Award at 17–18. Grievance procedures are delineated in Paragraph 7(B) (relating to health and safety disputes), and provide for a "contract reopener" in the event that disputes cannot be resolved through negotiations.

expedited means of dispute resolution, with limited judicial intervention." *Borough of Ellwood City v. Ellwood City Police Dep't Wage & Policy Unit*, 573 Pa. 353, 360, 825 A.2d 617, 621 (2003); *see Moon Twp.*, 508 Pa. at 507, 498 A.2d at 1311 ("[T]he purpose of the legislature's promulgation of Act 111 was to provide a vehicle to permit police and fire personnel, who render so vital a service to the public, to effectively resolve employment disputes with their employers as an alternative to a disruptive work stoppage.").

While I agree with the majority that Paragraph 12 intrudes into an area of decision making that can reasonably be characterized as implicating managerial prerogatives, I consider such intrusion to be an acceptable one, particularly as it is essentially in the nature of a review. As well, it should be remembered that some overlap in this regard is not untoward, as Act 111 employees are statutorily precluded from striking, *see* 43 P.S. § 215.2; *Moon Twp.*, 508 Pa. at 502–03, 498 A.2d at 1308–09; *Phila. Fire Officers Ass'n v. PLRB*, 470 Pa. 550, 553–54, 369 A.2d 259, 260 (1977), and, to compensate, the General Assembly provided such employees with the ability to bargain collectively and submit unresolved disputes to binding arbitration. *See Pa. State Police v. Pa. State Troopers Ass'n (Smith)*, 559 Pa. 586, 591–92, 741 A.2d 1248, 1251 (1999). Notably, this legislative compromise is upset to some extent by the judicial adoption of narrow certiorari review—which this Court has viewed as a necessary means of resolving the inherent tension between the legislative command of finality and the residual need to avoid "investing Act 111 arbitrators with limitless powers." *City of Phila. v. FOP, Lodge No. 5*, 564 Pa. 290, 299, 768 A.2d 291, 296 (2001).

As applied presently, I find it relevant that Paragraph 12 indicates that its procedures are intended to reach a resolution "as quickly as possible," and specifies that the "requirement to conduct [a pre-closure] impact study is not intended to circumvent the City's managerial right to implement [its closure] plan," but to "provide for a complete and meaningful review of staffing and safety impact issues before such managerial prerogative may be exercised." Award at 15. It appears to me,

therefore, that the City would be able to implement its reorganization plan subject to the delineated mechanism for resolving disagreements concerning the safety effects of the planned fire company closures.

I recognize, of course, that the City's plan could be delayed somewhat—as compared to a situation in which the plan's safety effects are addressed only after the closures are complete—and that this may impact the City's budget to some degree. In this respect, the City highlights a series of Commonwealth Court decisions emphasizing that "certain ultimate policy decisions, *i.e.*, those related to overall service levels and budget, *cannot* be made by labor arbitrators, so that the arbitrable health and safety issues may not impede implementation of the decision but should proceed subsequently." Brief for Appellee at 26 (emphasis in original). I am not convinced, however, that making dispute resolution concerning the safety effects of the plan a prerequisite to company closure automatically converts Paragraph 12's mandates into an undue infringement upon the City's managerial prerogatives. Rather, that aspect of the Award was evidently devised to assure that the bargaining unit members' interests in workplace safety—a matter of particular concern given the dangers inherent to their work—would be protected, while still allowing the City to implement its reduction plan within a reasonable time frame.

Still, the City avers that the underlying purpose of the mandated pre-closure bargaining is to permit the Union to influence and ultimately alter the City's decision concerning which fire companies to close, inasmuch as such decisions could not be made upon the City's analysis alone, but only after what the Union considers a proper evaluation, and eventual arbitration, of the impacts of the closures. The City proffers that allowing the Union to interfere with its organizational plan in this way would render its "right" to implement fire company closures meaningless. While I do not consider this to be a trivial concern, I would interpret the substance of Paragraph 12 as allowing the closures the City deems necessary to proceed, albeit with any settled-upon modifications to

the conditions of employment so that the legitimate safety needs of the bargaining unit members are more likely to be met. The same closures could proceed as would be possible if post-closure negotiations and bargaining were mandated, but in a delayed timeframe. The City might ultimately decide to alter its plan as the process unfolds, but that would be the City's decision in the end.

I am also aware—as the City argues—that the Union could potentially misuse Paragraph 12's procedural mechanisms to unduly delay the implementation of the City's plan and, thus, to interfere with the City's managerial prerogatives as a *de facto* matter. However, the present record does not reflect any basis to conclude that the provision would become a license for the Union to engage in dilatory or vexatious behavior. Given that our present review is by nature substantially restricted, *see generally Twp. of Sugarloaf v. Bowling*, 563 Pa. 237, 241, 759 A.2d 913, 915 (2000) ("To ensure that resolution of labor disputes [between police and firefighters and their public employers is] both swift and certain, involvement by the judiciary in the resolution of Act 111 disputes is most severely circumscribed."); *Town of McCandless v. McCandless Police Officers Ass'n*, 587 Pa. 525, 544, 901 A.2d 991, 1003 (2006), I believe that we would overstep our own limited role under the narrow certiorari doctrine to presume such an eventuality as a factual matter at the present juncture.[2]

2. Additionally, the Union is obliged to abide in good faith by the provisions of the collective bargaining agreement as modified. *See generally* 43 P.S. § 217.7(a). While the question of the City's remedy for dilatory behavior on the part of the Union is not presently before the Court, I note in passing that, if the City suspects the Union is utilizing Paragraph 12's procedures in a manner designed solely to delay the inevitable, it may have a cause of action to enforce the contract, *see Hollinger v. DPW*, 469 Pa. 358, 365 n. 10, 365 A.2d 1245, 1249 n. 10 (1976), or it may be able to file a complaint with the PLRB if, indeed, the Union's conduct amounts to an unfair labor practice. *See, e.g.,* 43 P.S. § 211.6(2)(d) (providing that it is an unfair labor practice under the PLRA for a labor organization to, *inter alia,* "hinder or prevent *by any means whatsoever,* the ... disposition of materials, equipment or services" (emphasis added)). *See generally Phila. Fire Officers Ass'n,* 470 Pa. at 555, 369 A.2d at 261 (holding that the PLRA and Act 111 are *in pari materia* and should be read together as a single statute); *City of*

Thus, I would ultimately conclude that the pre-closure negotiation and bargaining mechanism outlined in Paragraph 12 is rationally related to firefighter health and safety, and does not unduly infringe upon the City's managerial responsibilities.

I also do not find Paragraph 12 to represent an excessive assertion of power by the panel because the topic of the safety effects of the fire company closures was an issue in dispute before the arbitrators, *see Phila. Firefighters' Union, Local 22 v. City of Phila.*, 901 A.2d 560, 564 (Pa.Cmwlth.2006) (reciting that the grievance arbitration award at issue there made the "health and safety impact of the [City's] Redeployment Plan an 'Issue in Dispute' during" the City's interest arbitration for a new "Agreement to become effective July 1, 2005"), and the provision does not obligate the City to perform an illegal act. *See Lodge No. 5,* 564 Pa. at 299, 768 A.2d at 296–97 ("[I]f the acts the arbitrator mandates the employer to perform are legal and relate to the terms and conditions of employment, then the arbitrator did not exceed her authority.").

Accordingly, because the arbitrators did not, in my view, exceed their power in formulating Paragraph 12, I would uphold that portion of the Award.

Justice BAER joins this concurring and dissenting opinion.

Justice McCAFFERY, concurring and dissenting.

Because I believe that the arbitration panel acted within its powers and authority in awarding the relief set forth in Paragraphs 12 and 9A of the arbitration panel's opinion and award, such award is beyond our narrow *certiorari* scope of review, and hence beyond any court's power to alter. I base my conclusion on the indisputable facts that the awards contained in Paragraphs 12 and 9A plainly address "terms and

*Bethlehem v. PLRB,* 153 Pa.Cmwlth. 544, 548, 621 A.2d 1184, 1186 (1993) (finding that the PLRB has jurisdiction to entertain such complaints in the Act 111 context). In either venue, the City would have an opportunity to make a record in support of its position that the Union is acting in bad faith, and the adjudicative body's determination of whether relief is warranted would have to account for the Award's general stipulation that the Union may not circumvent the City's managerial right to implement its plan. *See* Award at 15.

conditions of employment" as defined by Section 1 of Act 111, 43 P.S. § 217.1, and would not force the City, as employer, to commit an illegal act. Thus, I dissent from the Majority Opinion's analysis and disposition of Paragraphs 12 and 9A (Parts IV(A) and IV(B) of the Majority Opinion). Additionally, I dissent to Part III of the Majority Opinion, which Part constitutes the analytical basis for the majority's disposition regarding Paragraphs 12 and 9A. Respectfully, I believe that the Majority Opinion's recognition in Part III of a dominant managerial prerogative in Act 111 is without foundation in the language of the act and impermissibly expands the reach of our narrow *certiorari* scope of review. However, because I also believe that the Majority Opinion correctly concluded that the arbitration panel did exceed its power and authority in awarding the relief set forth in Paragraph 9B of the arbitration panel's opinion and award, I join in the majority's analysis and disposition of Paragraph 9B (Part IV(C) of the Majority Opinion).

In my respectful view, the Majority Opinion commits error on two fronts. First, it construes what I perceive as a facially unambiguous provision of Act 111 (Section 1) as ambiguous; then, on this basis, subjects it to a statutory interpretation analysis; omits consideration of what I respectfully posit are highly relevant rules of statutory interpretation; and arrives at a conclusion not suggested by, and effectively contrary to, the actual language of the statute. Second, it uses its conclusion to expand improperly, in my view, the "authority prong" of our narrow *certiorari* scope of review. Because Act 111 explicitly prohibits any judicial review of Act 111 arbitration awards (43 P.S. § 217.7), limited permissible judicial review under our established case law must remain extremely circumscribed; otherwise, we "undercut the legislature's intent of preventing protracted litigation in this arena." *Pennsylvania State Police v. Pennsylvania State Troopers Ass'n ("Troopers Smith and Johnson")*, 559 Pa. 586, 741 A.2d 1248, 1253 (1999). At the heart of this case is whether a court may review the arbitration panel's opinion and award at all.

"[T]he narrow *certiorari* scope of review limits courts to reviewing questions concerning: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) an excess in exercise of the arbitrator's powers; and (4) deprivation of constitutional rights." *Pennsylvania State Police v. Pennsylvania State Troopers' Ass'n ("Betancourt")*, 656 A.2d 83, 89–90 (Pa.1995). Here, as the Majority Opinion correctly concluded, we are concerned with only the third prong of the narrow *certiorari* scope of review, namely, the limits of the power or authority of the Act 111 arbitration panel, as the other three prongs are not implicated by the issues in this case. Thus, unless the arbitration panel's award in this case exceeded the authority granted to arbitrators by Act 111, the arbitration award is final and beyond the review of any court. *Betancourt, supra* at 89–90.

Section 1 of Act 111 defines the limits of the power or authority of an Act 111 arbitration panel or arbitrator, and provides in relevant part:

Policemen or firemen employed by a political subdivision of the Commonwealth or by the Commonwealth shall, ... have the right to bargain collectively with their public employers concerning the **terms and conditions of their employment,** including compensation, hours, **working conditions,** retirement, pensions and other benefits, and shall have the right to an adjustment or settlement of their grievances or disputes in accordance with the terms of this act.

43 P.S. § 217.1 (emphasis added).[1] In other words, "the [arbitration] award must encompass only terms and conditions

1. My reading of this Section requires that I distance myself from the Majority Opinion's conclusion that it is "ambiguous," which necessarily subjects the Section to statutory analysis. The Majority Opinion arrives at its conclusion that the Section is ambiguous because it determines that certain terms are "open-ended." Op. at 467, 999 A.2d at 567. However, to the extent any term is "open-ended," that alone does not make the term ambiguous: it simply makes the term open-ended. *See Delaware County v. First Union Corp.*, 992 A.2d 112, 118 (Pa.2010); *Barasch v. Pennsylvania Public Utility Comm'n*, 516 Pa. 142, 532 A.2d 325, 332 (1987) (both holding that words of a statute are ambiguous when there are at least two reasonable interpretations of the text under review). Indeed, the Majority Opinion itself recognized that the Gener-

of employment and may not address issues outside of that realm." *Betancourt, supra* at 90 (citation omitted).

Additionally, even if the arbitration award concerns terms and conditions of employment, the award may not "mandate that an illegal act be carried out;" it "may only require a public employer to do that which the employer could do voluntarily." *Id.*[2] Prior to the ruling by the Majority Opinion in this case, this Court has permitted review in Act 111 cases under the authority prong of narrow *certiorari* only for determinations of whether the arbitration award addressed terms and conditions of employment and whether the award required the performance of a legal act. As we have aptly stated, "what constitutes 'an excess of an arbitrator's powers' is far from expansive." *City of Philadelphia v. Fraternal Order of Police, Lodge No. 5 ("Lodge No. 5")*, 768 A.2d 291, 296 (Pa.2001) (quoting *Troopers Smith and Johnson, supra* at 1251). "This third prong does not provide a portal to unlimited review of an Act 111 arbitration award." *City of Pittsburgh v. Fraternal Order of Police, Fort Pitt Lodge No. 1*, 595 Pa. 47, 938 A.2d 225, 230 (2007).

al Assembly **intended** Section 1 to "be viewed broadly, to encompass any subject that is rationally related to the 'terms and conditions of employment'...." Op. at 471, 999 A.2d at 569. Moreover, the Majority Opinion had no difficulty ascertaining that the subjects of Paragraphs 12 and 9A of the arbitration panel's opinion and award encompassed terms and conditions of employment. *Id.* at 474–76, 477, 999 A.2d at 571–72, 573. This Court has never before considered Section 1 to be ambiguous. "It is therefore our judgment that [S]ection 1 is free of any ambiguity and must be accepted in accordance with its terms." *Philadelphia Housing Authority v. PLRB*, 508 Pa. 576, 499 A.2d 294, 299 (1985) (construing Section 1 to determine whether the Philadelphia Housing Authority is a public employer under its provisions). Accordingly, I believe that this Court is obligated to apply Section 1 simply as written. 1 Pa.C.S. § 1921; *Colville v. Allegheny County Retirement Board*, 592 Pa. 433, 926 A.2d 424, 431 (2007) ("The touchstone of statutory interpretation is that where a statute is unambiguous, the judiciary may not ignore the plain language under the pretext of pursuing its spirit, ... for the language of a statute is the best indication of legislative intent.") (citation and quotation marks omitted).

2. Those matters that an employer may **voluntarily perform** include the enactment or promulgation of legislation, ordinance, or regulation, as the case may be. An Act 111 arbitration award **mandates** the public employer to enact any legislation or promulgate any regulation necessary to carry out the provisions of the award. 43 P.S. § 217.7.

Here, Paragraphs 12 and 9A of the arbitration panel's opinion and award unquestionably address "terms and conditions of employment." The Majority Opinion concedes as much. *See* op. at 474–76, 477, 999 A.2d at 571–72, 573. Further, the award does not require the City to perform an illegal act. The requirements of Paragraphs 12 and 9A are those that the City may voluntarily meet within the law. Moreover, the provisions of Paragraphs 12 and 9A consider and incorporate the managerial rights of the City.[3] If the arbitration panel purportedly "insufficiently considered" management rights with respect to the working conditions at issue, I believe that this circumstance falls within the realm of "legal error," and thus is not reviewable. *Betancourt, supra* at 90. Accordingly, pursuant to the plain language of Act 111 and our case law preceding the present Majority Opinion, the arbitration award, with respect to Paragraphs 12 and 9A, clearly fell within the authority of the Act 111 arbitration panel. Hence, the award is beyond this Court's or any court's power to review, no matter what the result.[4]

However, under a rule of its own invention, the Majority Opinion avoids such plain and straightforward application of the narrow *certiorari* scope of review to a genuinely clear-cut Act 111 arbitration award. The majority's rule states that even if an Act 111 arbitration award plainly, even indisputably, addresses terms and conditions of employment, a reviewing court may nonetheless decree that the award, rather magical-

3. *See, e.g.,* the preamble to Paragraph 12, which provides that "[i]t is understood that the determination of the overall size of the Fire Department is ultimately a managerial decision." Arbitration Opinion and Award at 22. Moreover, the underlying collective bargaining agreement, to which subsequent modifications have been made over the years, notes that the City "at all times maintains its managerial responsibilities and prerogatives." Collective Bargaining Agreement, covering the term July 1, 1986 through June 30, 1988, at 1.

4. The subject of Paragraph 9B of the arbitration award may also potentially concern "terms and conditions of employment." However, because in Paragraph 9B, the arbitration panel made an award on an issue not properly raised by either party, I join the Majority Opinion's determination that the arbitration panel lacked the authority to make such award. *See* 43 P.S. § 217.4(a) (providing that either party to an Act 111 dispute may request arbitration, "after written notice to the other party containing specifications of the issue or issues in dispute.").

ly, **no longer** addresses or concerns terms and conditions of employment if the award, as determined by the court, "unduly infringes" upon vaguely-defined "managerial responsibilities" or prerogatives. Op. at 472, 999 A.2d at 570. Thus, under such rule, when terms and conditions of employment, as defined by Section 1 of Act 111, are judicially transmogrified into not being terms and conditions of employment, the relevant issue is now "outside" of Section 1 of Act 111 and, accordingly, is no longer under the "authority" of Act 111 arbitrators to decide. Respectfully, I cannot be a part of what is effectively the judicial rewriting of Section 1 of Act 111 and broad expansion of the authority prong of narrow *certiorari.*

Let me make clear: I have no dispute with a court's power to review, under the authority prong of the narrow *certiorari* scope of review, whether an Act 111 arbitration award legitimately addresses terms and conditions of employment as defined by Section 1 of Act 111. *See Town of McCandless v. McCandless Police Officers Ass'n,* 587 Pa. 525, 901 A.2d 991, 1000 (2006) ("Generally speaking, a plenary standard of review should govern the preliminary determination of whether the issue involved implicates one of the four areas of inquiry encompassed by narrow *certiorari,* thus allowing for non-deferential review—unless, of course, that preliminary determination itself depended to some extent upon arbitral fact-finding or a construction of the relevant CBA."); *Betancourt, supra* at 90 ("[T]he award must encompass only terms and conditions of employment and may not address issues outside of that realm.").

However, what the Majority Opinion holds here strays radically, in my respectful opinion, beyond such appropriately limited review. The Majority Opinion, in addition to effectively rewriting Section 1 of Act 111, has effectively expanded the authority prong of narrow *certiorari* in a manner that, in my view, impermissibly "undercut[s] the legislature's intent of preventing protracted litigation in [the Act 111] arena." *Troopers Smith and Johnson, supra* at 1252–53 (wherein, in an Act 111 case, we rejected an attempt to expand the narrow *certiorari* scope of review with a public policy exception,

relevantly stating: "If we were to adopt the State Police's recommendation to include this ill-defined term within the narrow *certiorari* scope of review, we would markedly increase the judiciary's role in Act 111 arbitration awards.").

Act 111 specifically and exclusively addresses the right of firefighters and police officers to bargain over their working conditions, which necessarily includes issues regarding firefighter or police officer safety, and mandates that any disputes concerning working conditions are to be adjudicated by arbitration without **any** judicial appeal. 43 P.S. §§ 217.1 and 217.7. Every issue regarding the health and safety of these critical public servants necessarily also falls under the realm of "managerial responsibilities and prerogatives" as contemplated by the Majority Opinion, as this case illustrates to a degree. Indeed, the conclusion is inescapable that "managerial responsibilities and prerogatives" encompass **everything** that may be considered "terms and conditions of employment." [5] Therefore, when this Court declares that all terms and conditions of employment are subservient to a dominant "managerial prerogatives" component in the third prong of the narrow *certiorari* scope of review, as determined by reviewing courts on a case-by-case basis, the Majority Opinion, in addition to effectively rewriting the explicit language of the General Assembly, creates the potential to **extinguish** even the **limited** nature of permissible judicial review. Any attorney for a public employer unhappy with an award will henceforth be remiss not to file an appeal of the objected-to portions of the award on grounds that the award, although addressing terms and conditions of employment, "unduly infringes" upon the employer's vaguely-defined dominant "managerial responsibilities." Under the Majority Opinion's precedent, reviewing courts will be required to decide the matter on appeal (and further appeal), and thus drastically alter the legislative scheme whereby disputes concerning terms and conditions of

5. What goal does a public employer have, or what position does it take, when bargaining a labor contract, except to assert its managerial rights and responsibilities? Every position an employer takes in the bargaining process asserts the employer's responsibilities and prerogatives.

employment were to be adjudicated **exclusively** by Act 111 arbitrators.

The Majority Opinion appears simply not to accept the possibility that the General Assembly actually considered the appropriate balance between the rights of firefighters and police officers and those of public employers when it drafted Act 111, and accordingly already gave thought to the role of "managerial prerogatives" in the remedial scheme it devised. Previously, we have described Act 111 as part of a "carefully crafted plan" that was "focused on making the division of rights and powers between management and labor more equitable." *Town of McCandless, supra* at 997 (quoting *Troopers Smith and Johnson, supra* at 1251–52). We further stated:

Act 111 was created to strike a more perfect balance between the need of the Commonwealth to insure public safety and the rights of the worker. To protect the need of the Commonwealth, police and fire personnel were still denied the right to strike. The rights of the worker were to be safeguarded through collective bargaining rights and arbitration provisions. The interests of labor **and management, as well as those of the general public,** were to be safeguarded by a provision which forbad appeals from an arbitration award. This swift resolution of disputes decreased the chance that the workforce would be destabilized by protracted litigation, a state harmful to all parties.

*Betancourt, supra* at 89 (citation and footnote omitted; emphasis added).[6] We have never before viewed Act 111 as suffering from a gaping hole into which the judiciary must insert its own test in order to safeguard, not the rights of

6. Indeed, Act 111's explicit inclusion of the component of swift, final arbitration awards from which there were to be no appeals (now undercut by the Majority Opinion's judicially-created dominant managerial prerogatives component that will henceforth overshadow the act) is not any sundry provision. It is the **"linchpin of"** Act 111, as "an Act 111 arbitration panel's resolution of [a] dispute must be sure and swift, [or] much of its effectiveness would be lost if the mandate of its decision could be delayed indefinitely through protracted litigation." *Betancourt, supra* at 89 (emphasis added; quoting *City of Washington v. Police Department of City of Washington,* 436 Pa. 168, 259 A.2d 437, 440 (1969)).

firefighters and police officers to bargain over and have arbitrators decide issues regarding their working conditions, as is the express intent of the act, but "managerial prerogatives" of public employers.

On the contrary, we have previously noted the extraordinary and unique nature of Act 111 itself. Act 111 was born from an explicit constitutional amendment.[7] This constitutional amendment authorized legislation that would (1) provide for compulsory final, non-appealable awards addressing disputes over the terms and conditions of employment of firefighters and police officers; and (2) delegate to the tribunals deciding such disputes the power to compel public employers to enact legislation or promulgate regulations in order that such final, non-appealable awards could be implemented. The pertinent legislation resulting from this constitutional amendment is set forth at Section 7 of Act 111.[8] *See Philadelphia Housing*

7. *See* Article 3, Section 31 of the Pennsylvania Constitution, which provides:

> The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever.
> Notwithstanding the foregoing limitation or any other provision of the Constitution, the General Assembly may enact laws which provide that the findings of panels or commissions, selected and acting in accordance with law for the adjustment or settlement of grievances or disputes or for collective bargaining between policemen and firemen and their public employers shall be binding upon all parties and shall constitute a mandate to the head of the political subdivision which is the employer, or to the appropriate officer of the Commonwealth if the Commonwealth is the employer, with respect to matters which can be remedied by administrative action, and to the lawmaking body of such political subdivision or of the Commonwealth, with respect to matters which require legislative action, to take the action necessary to carry out such findings.
> PA. CONST. Art. 3, § 31.

8. Section 7 of Act 111 reads in its entirety:

> (a) The determination of the majority of the board of arbitration thus established **shall be final** on the issue or issues in dispute and shall be binding upon the public employer and the policemen or firemen involved. Such determination shall be in writing and a copy thereof shall be forwarded to both parties to the dispute. **No appeal therefrom shall be allowed to any court. Such determination shall**

*Authority v. Pennsylvania Labor Relations Board,* 508 Pa. 576, 499 A.2d 294, 301 n. 8 (1985) ("The binding aspect of [Act 111's] arbitration procedure is essential to the legislative scheme.... A constitutional amendment was passed in 1967 to permit this binding procedure. Pa. Const. Art. III, § 31."); *Township of Moon v. Police Officers of the Township of Moon,* 508 Pa. 495, 498 A.2d 1305, 1311 (1985) ("The public's interest in approving the constitutional amendment and the purpose of the legislature's promulgation of Act 111 was to provide a vehicle to permit police and fire personnel, who render so vital a service to the public, to effectively resolve employment disputes with their employers as an alternative to a disruptive work stoppage. To interpret the statute in [ ] a manner as to frustrate this objective is obviously an unacceptable result.") (footnote omitted); *City of Washington v. Police Department of City of Washington,* 436 Pa. 168, 259 A.2d 437, 442 (1969) (interpreting Article 3, Section 31 and stating, "[i]t is clear then that this provision **does not,** by its own force, **place any specific limit on the authority of the [Act 111] arbitrators.**") (emphasis added).

Respectfully, I cannot conclude that the Majority Opinion's holding in this case is compatible with Section 7 of Act 111 or its constitutional mandate. It is inconceivable that a statutory and constitutional directive that an arbitration award serve as a mandate to a political body to timely enact legislation or promulgate regulations is compatible with the idea that the same arbitration award is subservient to a robust and domi-

**constitute a mandate to the head of the political subdivision which is the employer,** or to the appropriate officer of the Commonwealth if the Commonwealth is the employer, **with respect to matters which can be remedied by administrative action, and to the lawmaking body of such political subdivision** or of the Commonwealth **with respect to matters which require legislative action, to take the action necessary to carry out the determination of the board of arbitration.** (b) With respect to matters which require legislative action for implementation, **such legislation shall be enacted,** in the case of the Commonwealth, within six months following publication of the findings, and, in the case of a political subdivision of the Commonwealth, **within one month** following publication of the findings. The effective date of any such legislation shall be the first day of the fiscal year following the fiscal year during which the legislation is thus enacted. 43 P.S. § 217.7 (emphasis added).

nant "managerial prerogative" enjoyed by that same political body. Of what value is Act 111's command that the interest arbitration award serve as a mandate for the government employer to pass any law or promulgate any regulation to implement an arbitration award if a reviewing court's notions of dominant "managerial prerogatives" deprive interest arbitration panels of authority or jurisdiction over the actual matters that may require the passage of laws or promulgation of regulations to implement the award? [9]

I highlight Section 7 of Act 111, as well as Article 3, Section 31 of the Pennsylvania Constitution, in order to underscore my view that in Act 111, the General Assembly has already considered the reach of "managerial prerogatives" over matters concerning terms and conditions of employment of firefighters and police officers. Under a plain reading of Act 111, terms and conditions of employment for firefighters and police officers are not subservient to the public employer's managerial prerogatives; rather, the opposite is wholly evident. I respectfully posit that this is part of the General Assembly's "carefully crafted plan."

Also part of the General Assembly's "carefully crafted plan" of public employment legislation is the Public Employee Relations Act ("PERA").[10] *See Betancourt, supra* at 89. PERA concerns public sector employees specifically **not** covered by Act 111; it **lacks** Act 111's "no-appeal" mandate; and, unlike Act 111, it **specifically excludes** from employee bargaining "matters of inherent managerial policy.". 43 P.S. § 1101.702. Accordingly, PERA has a "managerial prerogatives" component expressly stated therein.

PERA was enacted only two years after Act 111. It evidences the General Assembly's ability to construct legislation imposing, and fully recognizing, a "managerial prerogative" concept that expressly limits bargainable employment

9. Further, as I have previously noted, I respectfully believe that the Majority Opinion's holding effectively guts Section 7's "no appeal" mandate, the actual "linchpin" of the entire act.

10. Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101–1101.2301.

terms and conditions of public workers. I believe it significant to any statutory analysis of Act 111 to recognize that the General Assembly explicitly set forth a "managerial prerogatives" component in PERA, but explicitly omitted one from Act 111. *See L.S. ex rel. A.S. v. Eschbach*, 583 Pa. 47, 874 A.2d 1150, 1156 (2005) (quoting *Kusza v. Maximonis*, 363 Pa. 479, 70 A.2d 329, 331 (1950)) ("[I]n construing a statute, the court must ascertain and give effect to the legislative intention as expressed in the language of the statute, and cannot, under its powers of construction, supply omissions in a statute, especially where it appears that the matter may have been intentionally omitted."); *Fonner v. Shandon, Inc.*, 555 Pa. 370, 724 A.2d 903, 907 (1999) ("[W]here the legislature includes specific language in one section of the statute and excludes it from another, the language should not be implied where excluded. Moreover, where a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent." I quote this passage because I believe the stated principles have even more force and relevance when one statute contains a specific provision but another, purportedly "similar" statute, omits such a provision); *Commonwealth v. Shafer*, 414 Pa. 613, 202 A.2d 308, 312 (1964) (quoting *Commonwealth ex rel. Cartwright v. Cartwright*, 350 Pa. 638, 40 A.2d 30, 33 (1944)) ("[The General Assembly] could have done so, and it may even have intended to do so, but the fact is it did not do so.").

By imposing a robust "managerial prerogatives" component upon Act 111 and its concomitant narrow *certiorari* scope of review, the Majority Opinion has effectively erased the principal substantive difference between Act 111 and PERA, despite the fact that it is eminently clear that the General Assembly had intended to maintain different statutory schemes.[11] This Court has frequently noted that the significant substantive differences between Act 111 and PERA are evident from the greater importance of firefighters and police officers to the health and safety of our citizenry than other public employees,

11. Significantly, Act 111, unlike PERA, required passage of a constitutional amendment to authorize its unique goals.

as important as those other employees are.[12] I would add that under Act 111, firefighters and police are treated differently from other public employees not only because of the services they provide to the general public, but also because of what the public asks and demands of them. We expect of these public employees each day to take risks to personal safety that ordinary citizens would be unlikely to consider or even anticipate. Health and safety issues are not an occasional concern or a remote abstraction to firefighters and police. They are a daily fact of work life. They loom large every time these unique public employees report for duty, and they often take center stage in interest arbitration negotiations. Thus, the reasons the General Assembly had for singling out firefighters and police for special treatment of labor issues, divorced from ordinary concepts of labor relations found in the private sector or even in PERA, are self-evident, and cannot be ignored by this Court in undertaking any analysis of Act 111.

Finally, there is nothing evident from any statutory construction analysis that I can identify that supports the Majority Opinion's position that if a statutory provision is "ambigu-

12. *See Philadelphia Housing Authority v. PLRB*, 508 Pa. 576, 499 A.2d 294, 300–01 (1985) ("[In contrast to PERA,] **Act 111 was intended to carve out a select group of public employees for special treatment** because of the essential nature of the services they perform. To attempt to superimpose PERA's definition of "public employer" upon Section 1 of Act 111 ignores the clear legislative intent to restrict the applicability of Section 1 [in part] based upon the service being delivered by the employee ....") (citations omitted; emphasis added); *Geriot v. Council of Borough of Darby*, 491 Pa. 63, 417 A.2d 1144, 1146–48 (1980) (wherein we rejected the Commonwealth Court's application to Act 111 of a provision from PERA regarding enforcement of awards, explaining that the Commonwealth Court erred by "ignor[ing] the 'unique and specific procedures' provided in Act 111 which were tailored by the Legislature to the specific requirements of the employment relations of municipalities and police and fire labor forces."); *Township of Sugarloaf v. Bowling*, 563 Pa. 237, 759 A.2d 913, 916 (2000) ("While the public employees covered by PERA obviously perform useful services for the citizens of this Commonwealth, their functions are not as critical to the continued stability of a peaceful society as are those performed by police and firefighting personnel." Thus, "[a]s sagaciously recognized by the legislature, disputes involving police and firefighting personnel are to be resolved swiftly in order to prevent labor unrest, and arbitration is the nimble mechanism which can meet this timeliness challenge.").

ous" because its definitional terms are "open-ended,"[13] then a court may impose a condition or test whereby the legislative definitions are severely modified by a concept not even remotely mentioned in the underlying legislation. Thus, **if** Section 1 and the narrow *certiorari* scope of review need to be modified to more finely incorporate concerns regarding "managerial prerogatives" of public employers, then I believe, in accordance with the numerous matters I raise in this writing, that the Court must find as narrow an exception from the plain language of Act 111 as possible. I see absolutely no grounds for the imposition onto Act 111 of the robust, dominant concept of "managerial prerogatives" devised by the Majority Opinion that I deem to be devastating to the limitations of narrow *certiorari* and contrary to the undisputed expansiveness of the text of Act 111 itself.

Accordingly, for a great multitude of reasons, I respectfully dissent from Parts III, IV(A), and IV(B) of the Majority Opinion.

---

**13.** Again, I continue to dispute that Section 1 is ambiguous.